(88 South. 788)

Nos. 21795, 23171.

Succession of CARTER.

CARTER v. VEITH et al.

(May 30, 1921.)

*(Syllabus by the Court.)*

1. **Judgment ⬤⟲456(2)—Action by heir to annul judgment putting widow and heirs in succession barred unless brought within year.**

An action brought by one of the heirs, and petitioners therefor, to annul a judgment putting the widow and heirs in possession of the estate of the deceased husband and father, including the community interest of the widow, upon allegations of fraudulent misrepresentation on the part of the other parties thereto in the obtention of such judgment, and ignorance and error on the part of the heir attacking, is prescribed unless brought within the year after the fraud has been discovered.

2. **Descent and distribution ⬤⟲82—Succession; person may waive obstacle of illegitimacy and concur in judgment putting unfortunate brother in succession.**

There is no law of this state which precludes a person who is sui juris from waiving the obstacle of illegitimacy and concurring with his unfortunate brother in a judgment putting them in possession of the estate of their common parents; such action is an authoritative renunciation of any right in conflict with those recognized by the judgment.

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Succession of Emanuel George Carter, deceased. Action by Georgia Carter against Mrs. Philip G. Veith and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Florence Loeber, of New Orleans, for appellant.

Johnston Armstrong, of New Orleans, for appellee Mrs. Philip G. Veith.

Legier & Gleason, of New Orleans, for appellee Mrs. Mary V. Carter.

### Statement of the Case.

MONROE, C. J. Emanuel George Carter died in January, 1899, leaving a widow and five children, an olographic will, whereby he bequeathed to them (naming them) all the property of which he died possessed, and an estate in community. The maiden name of the wife was Mary Ann Fagin; the children were named, respectively, and in the order of their births, Mary Vivian, Virginia Violet, Blanche, Lucy, and Georgia. The two first named were born prior to the marriage of their parents, but were reared and treated in every respect as were the other three, who were born after the marriage. The will was proved, registered, and ordered to be executed, shortly after the demise of the testator, at the instance of the widow, who was named and confirmed as executrix, and the inventory which she caused to be made showed the one-half interest of the decedent in the community estate as valued at $1,569.95. In 1908, Blanche, who was then the wife of F. B. Trenchard, instituted a suit against her sister Mary Vivian (as we understand), who was then the wife of W. P. Carter, and against Philip G. Veith, who was then the husband of her sister Virginia Violet; the purpose of the suit being to compel the return to the succession of certain property which, we infer (the petition in the case not having been filed in evidence herein), she alleged had been conveyed to them by her parents, which suit was subsequently compromised, and concerning which and its compromise, and the knowledge of the present plaintiff of its character and purpose, of the disposition so made of it, and of the circumstances connected with the filing by the widow and heirs of a petition to be put in possession, and the judgment thereon which followed, the attorney who represented the plaintiff and her mother in some of those proceedings gives the following, with other, testimony, to wit:

"My recollection of the matter * * * is that when I filed this suit for Mrs. Trenchard we treated the illegitimate children [referring to Mrs. W. P. Carter and Mrs. Veith] as not having any right in the estate. The matter was compromised and settled, and when the final settlement was * * * made, and the petition signed by Mr. Henriques and myself and Mr. Armstrong and other lawyers, Mrs. Haynes [being the Widow Carter, who had married Thomas Haynes], and Miss Georgia Carter certainly knew, because it was discussed, that to avoid any question of delay—lawsuit, holding up the matter—all children would come in, share and share alike, although there might have been some doubt as to the right of two of them, because they were illegitimate—the two eldest, * * * Mrs. Trenchard compromised her suit, but even then it was discussed, pro and con, among them all, that this status still existed; that these children were born out of wedlock; and to hide this family skeleton and to prevent it coming out into the open, and having any delay in the matter, they finally agreed to share and share alike, as detailed in the last petition [meaning the petition of the widow and heirs to be put in possession]. * * * We signed, representing Mrs. Haynes and Mrs. Carter; it was for the purpose of letting bygones be bygones, and forgetting the past and having the thing settled as detailed in that petition.

"Q. * * * Miss Georgia was not a party to that (Trenchard) suit, was she? A. She was not; she was to benefit as a result of the suit. * * * I know she [Mrs. Trenchard] was bought out, * * * and the suit fell; and it wasn't very long after that when Mrs. Haynes and Miss Georgia were in the office and this matter was settled. We explained to them that they might be able to make a fight on the illegitimacy of these two elder sisters, and possibly exclude them from participating at all, but—

"Q. You told them that? A. Unequivocally, unquestionably, I did; but that we might lose, and it would rake up a disagreeable incident in the dim and distant past, and the proper thing to do would be to let them come in and share and share alike. * * * For me to tell you that Miss Georgia told me [that her elder sisters were born out of wedlock], or Mrs. Haynes told it to me, or Mrs. Trenchard told it to me, or Mrs. Trenchard, or one of the other heirs, I can't tell you; but I can state, positively, that all of them knew about it, and discussed it and talked of it."

It is shown that "the community was discussed also," meaning, as we understand it that the rights of the widow with respect to property acquired by Carter and herself, prior to their marriage, but while they lived and held themselves out as husband and wife, which right appears to have been conceded with the understanding that she was to claim nothing under the will (and she claimed nothing).

On October 13, 1909, Lucy Carter sold her entire interest in the succession of her father to her sister Virginia Violet, after which, on February 23, 1910, the widow (then Mrs. Haynes), for one-half, Mrs. W. P. Carter, for two-tenths, Mrs. Veith, for one-tenth, Philip G. Veith, for one-tenth, and Miss Georgia Carter (who had been emancipated by judicial decree, as a minor over 18 years of age), for one-tenth, joined in a petition to be put in possession in those proportions, and judgment was rendered to that effect. On February 2, 1911, Mrs. Haynes and Miss Georgia Carter sold to W. P. Carter certain property, particularly described, "and all their individual rights, titles, interest, actions, demands, effects, property, and claims in and to the succession of the late Emanuel George Carter"; the consideration being $1,552, payable partly in cash and partly in notes. And on February 17, 1917, Mrs. Georgia Carter (the prefix "Mrs." being used for the reason that Miss Georgia Carter, after some experience of matrimony, had resumed her maiden name) brought this suit, alleging that the judgment of February 23, 1910, recognizing the widow and heirs and putting them in possession, was obtained by fraudulent misrepresentation on the part of her sisters Mrs. Carter and Mrs. Veith, and ignorance and error on her part, in that she had not known, until November 15, 1914, that they were born out of wedlock.

In addition, however, to the testimony on that subject which we have hereinabove quoted, there is other evidence to the same effect, and, taking it altogether, with the

surrounding circumstances, we are satisfied that plaintiff was fully informed in regard to the status of her sisters prior to the time, in 1910, when she participated in the obtention of the judgment recognizing them as heirs and putting them and the other petitioners, including plaintiff, in possession, and hence that she was a participant in the representation to the court, which she now alleges was a fraudulent misrepresentation, and because of which she now demands that the judgment predicated thereon should be annulled. The other evidence to which we have above referred is the following: C. O. Sawtelle, apparently disinterested and resident of Texas, testified, under commission, that he and Frederick Veith (brother of Philip) paid a visit in December, 1909, or January, 1910, to the house in Covington where plaintiff and her sister Lucy were living with their mother, and were listening to Miss Lucy play upon the piano when Miss Georgia rushed into the room, apparently very much excited, and asked Veith what business he had there and why he was meddling with family affairs, and that Veith replied that he was trying to adjust matters and have the suit that "Blanche" had brought against "Jennie" and Philip adjusted before the trial, as some disagreeable things might come out; to which "Georgia" replied that it was none of his business what suit "Blanche" brought nor what came out at the trial. And Veith, after corroborating Sawtelle, testified that, being anxious to keep from Sawtelle knowledge of the allegations in "Blanche's" petition, he walked over to Georgia, as hurriedly as he could, and said, "Please don't talk so loud; do you know the allegations Blanche makes in her petition?" to which she replied, "Of course, I do." Mrs. Poisson, who lived in the adjoining tenement, separated from the Carters only by a partition, through which there were several doors, testified that they usually talked for the bene-

fit of the neighbors, and that without listening, she heard a great deal of the conversation; that they frequently talked of the alleged illegitimacy of the older sisters, and that plaintiff was always there; that plaintiff told her that she hoped to goodness the suit would be withdrawn, because it would bring "up all that mess," and she would never catch a beau "she knew," says the witness, "what the mess was."

In March, 1910, plaintiff wrote the following to Philip Veith, to wit:

"Covington, La., March 17, 1910.

"Dear Philip: Mama received a letter from Woodville [one of the counsel employed by Mrs. Haynes] this morning, and we do not understand the contents. He says that the 'other side' objects to my mother having ½ of the row. I want to know who the other side is? Mamie [presumably her sister Mary Vivian Carter] wrote that she did not object, so who else is it that objects? I am getting sick of all this putting off and putting off, and if things are not settled I am going to file suit, as I think I am entitled to something, and in a lawful way, too. I don't want any of this blackmail either. Now, if you are on the other side, kindly let me know what all the protesting is about, and I want what is coming to me. It is all right to be amicable, but when things come to such a standstill as they are now, I think I ought to look out for myself. Hoping to hear from you, I remain, very truly yours, .

"[Signed] Georgia."

Plaintiff herself has given considerable testimony to the effect that they were always wrangling in the family about property, and that there were frequent discussions of family matters, but that she was young and indifferent and paid no attention to any of it; that she learned of the status of her elder sisters only a short time after the death of her sister Lucy, which occurred in the latter part of 1914, when she heard it from Mrs. W. P. Carter, who mentioned it to their mother, and that she (plaintiff) thereafter asked her mother about it and was told by her. The mother, on the other hand, who seemed to be aiding and abetting plaintiff in this suit, denied positively and repeatedly

that she had ever given her any information or had any conversation with her about it. On the other hand, we find plaintiff's alleged indifference and lack of curiosity about family matters and property rights to be inconsistent with the exhibition of interest which she is shown to have displayed, and with youthful and intelligent human nature in general. The young of the species are naturally curious, and fortunately so, since they have much to learn; the female has not shown herself less curious than the male; and we are unable to entertain the idea that plaintiff would allow herself to remain in ignorance of the matters here being considered while living in an atmosphere filled with easily accessible information.

### Opinion.

[1] Whether, after participating in the obtention of the judgment which she here seeks to annul, and after the selling by her and her mother to W. P. Carter of all their rights and claims in and to the succession of Emanuel George Carter, plaintiff is contemplating the possibility, in the event she succeeds in her present endeavor, of seeking to recover the portion of the succession in question which was adjudged to Carter's wife, we have no means of knowing; but, unless she has some such purpose in view, the only outcome of the present suit would seem to be to strike with nullity the judgment which she attacks, with no resulting benefit to herself, and, if she have such purpose in view, it seems a long shot which is not likely to hit the mark, since we here hold that she knew as much of the facts of the situation as it was possible to know, and as her vendee knew, when she made the sale. However that may be, we are of opinion that, knowing, as she did, more than a year prior to the institution of this suit, the facts upon which her allegations of fraudulent misrepresentation on the one part, and ignorance and error on the other, the action is prescribed; for

the law (C. P. 613) declares that the action to annul a judgment obtained through fraud must be brought within the year after the fraud has been discovered, and in this instance the plaintiff knew, when she participated in the obtention of the judgment which she now seeks to annul, all the facts upon which she predicates the present suit, and, knowing, did not bring the suit until after the lapse of nearly seven years. Nor is the applicability to the case presented of the law of prescription, thus cited, affected by the prohibition against the devolution of property upon illegitimate children; for, although these prohibitions were enacted for the benefit of legitimate heirs, and in the interest of public order and good morals and, although it is declared that "individuals cannot by conventions derogate from the force of laws made for the preservation of public order and good morals," it is also declared, in the same article of the Civil Code (article 11), that " * * * in all cases in which it is not expressly or impliedly prohibited, they [individuals] can renounce what the law has established in their favor, when the renunciation does not affect the rights of others and is not contrary to the public good."

[2] In this case, the participation of all the heirs, they being sui juris and being the only persons having an interest in the estate of their father, in the petition to the court, that they be recognized as heirs and sent into possession, share and share alike, and the obtention of the judgment in accordance with that petition, was a most authoritative renunciation, by each, in favor of all the others, of any right in conflict with those recognized by the judgment; since the right of no one else save the parties to the petition and judgment were affected thereby, and there is nothing contrary to the public good in the act of one child sharing with another of the same parentage the estate which, by no fault or virtue of either of them, has fallen to him

alone. The unfortunate child whom the law excludes in such case takes by virtue of the renunciation of his brother, and that which the other might lawfully give to him out of court, whether formally or informally, he may give to him in the form of a judgment to which both are parties. In a case very similar to this, it was said by the court:

"Counsel then invoke the various articles of the Civil Code concerning prohibitory laws, and the law regulating the devolution of property; but we fail to find that any of them preclude a person who is sui juris from waiving the obstacle of illegitimacy and concurring with his unfortunate brother in the obtention of a judgment putting them in possession, share and share alike, of the estate of their common parents." Succession of Rufin, 143 La. 828, 79 South. 421.

The judgment appealed from is therefore affirmed.