HARRIS *v.* HARRIS

5-3003 370 S. W. 2d 121

Opinion delivered May 20, 1963.

[Rehearing denied September 16, 1963.]

*Mann & McCulloch,* for appellant.

*Daggett & Daggett, Carrold E. Ray,* for appellee.

FRANK HOLT, Associate Justice. The appellee, Quincy Harris, by his next friend, Odell Barrier, brings this action against the appellants to establish his claim that he is the sole and only heir at law of the testator, James Harris, and as a pretermiteed child he is, therefore, entitled to inherit all of his estate, subject to the dower and homestead rights of decedent's widow. In his only will, dated in 1953, James Harris devised a life estate in all of his real estate to Ella Harris, his wife [who pre-deceased him], and upon her death he devised forty acres in fee to his foster son, the appellant Lee Andrew Harris, and then the remainder to the other appellants, in this manner:

"To my children, Jesse Harris, Roosevelt Harris, and Annie Bell Harris all the rest and remainder of my real estate in fee simple, as equal tenants in common." In 1958 Ella Harris died and thereafter James Harris married the appellant, Lettie Harris. In 1961, when James Harris died at 82 years of age, he had not changed any of the provisions of this will, although he had the county and probate clerk, who had the will in his office, to read it to him about seven months before he died.

The appellee, Quincy Harris, contends that appellants, Annie Bell Harris Shears, Jesse and Roosevelt Harris, are not legitimate children of James Harris. On

the other hand, the appellants question that Quincy Harris is a legitimate child of James Harris. The facts surrounding this litigation occurred over a period of approximately 68 years. The appellee, who is a resident of Mississippi, claims that James Harris was married to a Mehalie Hudson in Mississippi, and he is the only child of that marriage. He was born there in 1895, or when his father would have been 16 years of age. Quincy produced witnesses in support of the validity of this marriage and his parentage. There is no marriage certificate supporting this marriage. According to appellee, James [Jim] Harris abandoned him and his mother and came to Arkansas in 1903, or when appellee was eight years of age. Appellee presented evidence that Jim established contact with him beginning about 1948 and from then until Jim died in 1961 he visited him in Mississippi several times and Quincy visited him in Arkansas. There is evidence that James Harris acknowledged to witnesses, and in letters to Quincy that Quincy was his son. James was illiterate and these letters were written by his teenage granddaughter.

The appellants, Roosevelt Harris, Jessie Harris, and Annie Bell Harris Shears, all born in Arkansas, also contend that James Harris is their father. Annie Bell, who was born in 1898, testified that she understood James Harris to be her lawful father and that he came to Arkansas and married Ella Moore, her mother, no later than 1895. Jesse was born in 1902 and Roosevelt about 1904. One witness testified that he first met James Harris in Arkansas in 1900; that he was present in 1904 during a church trial of Ella Moore on charges of immorality when she testified that James Harris was the putative father of Jesse and her expected child [Roosevelt]; that Jim Harris escorted Ella to the church court that night and there said "that those two kids was his kids and that he would marry her. And they married in '04. And they was married by a preacher by the name of H. M. Townsend in the home of the bride." There is no marriage certificate to support this marriage either. It is undisputed that Jim and Ella Moore Harris lived together as husband and wife from about 1905 until Ella

died in January, 1958 and, further, that as husband and wife they reared Annie Bell, Jesse and Roosevelt as their own children. During this interval Jim acquired the lands in litigation.

It is admitted that Jim Harris is not the father of Lee Andrew Harris, the foster son. In 1919 Jim and Ella brought into their home Lee Andrew at five weeks of age who was the son of a neighbor family. In the community Lee Andrew was known, and so designated in Jim Harris' will, as a foster son. He was reared and treated by them as such a child.

The appellants, Annie Bell, Jesse, Roosevelt and Lee Andrew, while growing up in this family, assisted Jim and Ella Harris in the farming and maintenance of the property. It appears that Roosevelt aided in acquiring some of the land which Jim owned at the time of his death.

James Harris died on March 18, 1961. He owned 250 acres of land in Lee County which is the land involved in this litigation. Quincy Harris, with two carloads of his family and relatives, attended James Harris' funeral services on March 26, 1961. The next day the appellee and appellants went to the courthouse where the will was deposited with the county and probate clerk and had the will read to them and other members of their families. This group consisted of twelve or fourteen people. It was then discovered that Quincy's name was omitted from the will. Thereupon, the appellee, the appellants, and their families held a conference among themselves. On Quincy's demand for a part of the estate, or some of the ''dirt'', they reached an agreement and went directly to a lawyer's office where they asked him to draw the necessary deeds to effectuate their compact. The next day, on March 28, 1961, the appellee, Quincy Harris, with several of his children present, met the appellants, Roosevelt Harris, Jesse Harris and Mabel Harris, his wife, Annie Bell Harris Shears, Lee Andrew Harris and Flora Mae Harris, his wife, and the widow, Lettie Harris, in the lawyer's office and exchanged six partition deeds among themselves dividing the 250 acres.

According to these deeds, Quincy was alloted 20 acres, Lettie 10 acres, and the balance of the land was divided according to the tenor of the will, namely; Lee Andrew, 40 acres, Annie Bell, 60 acres, Jesse, 60 acres, and Roosevelt, 60 acres. The deeds were duly recorded.

On June 15, 1961, the appellee, Quincy Harris, filed suit to set aside these deeds and have the title to the 250 acres of land quieted in him subject to the dower and homestead rights of the widow, Lettie Harris. In his complaint the appellee contends that he is the sole and only legitimate child of Jim Harris; that none of the appellants, Roosevelt, Jesse, Annie Bell, and Lee Andrew, are legitimate children of Jim Harris; that as a pretermitted child he is, therefore, entitled to all of the estate; that the deeds executed by him are void because he was incompetent when he made them and, further, they were partition deeds and invalid because the appellants are not co-tenants.

The appellants denied his allegations and contend that they are legitimate children of Jim Harris and that the deeds are valid in every respect. Appellants pray that their title to the land described in the respective deeds be quieted in them. Upon a trial the Chancellor found that Quincy was the only legal child or heir of Jim Harris and a pretermitted child; that the appellants, Annie Bell Harris Shears, Jesse Harris and Roosevelt Harris are not the children or heirs of Jim Harris as they were in being when he came to Arkansas from Mississippi; that none of the appellants were legally adopted by Jim Harris and that the partition deeds should be cancelled and set aside because, first, they were partition deeds only and therefore vested no title in appellants because they were not co-tenants and, secondly, that Quincy Harris was incompetent at the time of the making of the deeds. The court cancelled the deeds and quieted the title to the lands therein described in the appellee subject to Lettie's dower rights. From this decree the appellants bring this appeal.

For reversal the appellants contend that the trial court erred in finding that Quincy Harris was the sole and only heir of Jim Harris and that Quincy was a pre-

termitted child; that the trial court erred in finding that none of the appellants was an heir of Jim Harris; that the trial court erred in setting aside the deeds on the grounds of incompetency and lack of consideration. Also, that the decree provided only for Lettie's dower interest and did not provide for her homestead rights.

In chancery cases we review and determine appeals *de novo, Nolen, et al,* v. *Harden, et al,* 43 Ark. 307. The appellee attempts to avoid the settlement deeds made in this case on the basis of being incompetent on March 28, 1961, when he signed these deeds and accepted one partitioning and dividing the property in question. To discharge the burden of proof of showing his incompetency, the testimony of Dr. Moore, a general practitioner where appellee lives in Mississippi, was introduced by deposition. He testified that he had administered to the appellee as a family physician before and after March 28, 1961, when the deeds were signed by the appellee. Dr. Moore testified that the last time he saw the appellee before March 28, 1961, was on November 25, 1960, and the next time be observed Quincy was on November 13, 1961. Thereafter, he saw him November 28, 1961 and on March 13, 17 and 21, 1962. Quincy became his patient the first time in August, 1960. In November, 1960, Quincy was hospitalized due to a foot infection and pneumonia. Dr. Moore described him as a nursing problem, confused and forgetful. He testified that his confusion varied and Quincy appeared about normal at times and at other times quite abnormal during hospitalization. He described Quincy's condition as being a fairly typical case of early senile arteriosclerosis dementia. He testified:

"In my medical opinion I do not feel that Quincy was competent at any time during the period of my observation. No day was different from any other." Other witnesses testified that at times appellee appeared confused, agitiated, forgetful, suspicious and had threatened members of his family.

The true test of Quincy's competency in this case is what was his mental capacity or competency when he

signed the deeds on March 28, 1961. No witness who observed him on that date testified that Quincy appeared incompetent then. On the contrary, the lawyer who drafted and explained the deeds and his secretary, who notarized the deeds, observed no incompetency about appellee on March 27 or 28, 1961. A Reverend Hart testified that he was with the group at the reading of the will, the conference thereafter, attended with them the meeting in the lawyer's office, and that Quincy "talked with good judgment." As stated, Quincy returned the next day with members of his family to consummate this agreement. Thus, he, with his children, had until the next day to reflect on his rights and the settlement of them by these deeds. No objection was ever made by appellee or anyone on either of these days as to his competency. Appellee signed the deeds in the presence of members of his family, it appears, by touching the pen and his daughter signing his name.

More than a year later, in May, 1962, when this cause was tried, the appellee, claiming to be incompetent, appeared as a witness in behalf of his claim of parentage. A review of his testimony reflects that he could remember distant and recent events. He recalled going to the lawyer's office and signing the deeds; he testified that James Harris was his father and he remembered seeing him when he was eight years old and the last time he remembered seeing him was when he died and he attended the funeral. Appellee testified he was about seventy years of age; he knew his mother's name; that Jim Harris told him, about three years before he died, that he owned 250 acres; that they had exchanged visits; that he was acquainted with the appellants; that he had no education and could not write; he remembered and identified various acquaintances in Mississippi; he remembered going to the courthouse and listening to the reading of the will; he remembered business transactions such as the purchase of a car in 1955; that he is presently indebted to Odell Barrier; and, further, that he had made an effort to sell the land which he had acquired by this questioned deed.

There is a presumption of law that every man is sane, fully competent and capable of understanding the nature and effect of his contracts. The burden of proving incompetency rested with the appellee, since he seeks to void the signing of these deeds.[1] In *Hunt* v. *Jones*, 228 Ark. 544, 309 S. W. 2d 22, this court said:

"Since the sanity and mental capacity of Miss McCray to make the deeds in question is presumed, the burden rested on the appellants to show her mental incapacity to execute them by a preponderance of the evidence. *Gibson* v. *Gibson*, 156 Ark. 528, 246 S. W. 845. As this court said in *Pledger* v. *Birkhead*, 156 Ark. 443, 246 S. W. 510: 'The familiar principles of law applicable to cases of this kind have often been announced by this court. If the maker of a deed, will, or other instrument has sufficient mental capacity to retain in his memory, without prompting, the extent and condition of his property, and to comprehend how he is disposing of it, and to whom, and upon what consideration, then he possesses sufficient mental capacity to execute such instrument. Sufficient mental ability to exercise a reasonable judgment concerning these matters in protecting his own interest in dealing with another is all the law requires. If a person has such mental capacity, then, in the absence of fraud, duress, or undue influence, mental weakness, whether produced by old age or through physical infirmities, will not invalidate an instrument executed by him." [Citing cases]

In the *Hunt* case, Miss McCray had executed two deeds, one in 1953 and one in 1954, which conveyed property owned by her. In 1954, at the age of 86, she died a few months after signing the last deed. Numerous collateral heirs attempted to have these deeds cancelled on the ground of her mental incompetency. Miss McCray also suffered from the disease of arteriosclerosis. Sometimes her mind was clear and at other times she was noisy, belligerent, and mentally confused. Her deeds were held valid.

[1] See Am. Jur., Deeds, § 376, p. 652 and Am. Jur., Insane Persons,. § 132, p. 253.

After a careful review of the evidence in the case at bar we think the appellee has failed to meet the burden of proof cast upon him to refute the presumption of his sanity or competency by a preponderance of the evidence. Therefore, the deeds are valid on that issue.

As to the remaining points, we prefer to rest our decision in this case upon the well-known family settlement doctrine which is a favorite of the law. According to the evidence in this case these partition deeds were in settlement of the estate based upon the appellee's claim to part of the property when he discovered, upon a reading of the will, that his name was omitted. Jesse Harris testified that the appellee, Quincy Harris, desired a division of the property. No witness disputed the following quoted testimony by Jesse and Annie Bell. Jesse testified as follows:

"Q. Well, how did you go about doing that?

A. He said he wanted to know what he was going to get before he went home.

Q. He wanted to know what he was going to get before he went home?

A. That's right; yes, sir. I asked 'Well, what do you want?' When I first asked him how much money he wanted he said he wanted some dirt.

Q. Some what?

A. Some dirt.

Q. He said he wanted some dirt?

A. Yes, sir. Then we asked him how much did he want. And he said 'well I'll be satisfied with what you all give me. I know you all been here all the time working it, and I'll be satisfied with what you all give me.' He said "you all been here all the time, and I'll appreciate what you all give me.'

Q. Now, how much land did he say he wanted?

A. That's what I'm saying now, he said 'I'll appreciate what you all do to me.' So we commenced laying it off, and he come down from thirty acres to twenty.

A. * * * And then we asked him if he would be satisfied with twenty and he said "yes, that's all right.' And all his family said 'yes, that would be nice.'

Q. You mean you all compromised on twenty?

A. Yes, sir; on twenty acres.

Q. Then did everybody seem to be satisfied?

A. Yes, sir. Everybody thought that was all right." He further testified that the purpose of the partition deeds was to avoid a lawsuit.

Annie Bell Harris Shears testified the settlement was with Quincy's approval. She testified:

"Q. And did Quincy say he was satisfied that day?

A. Quincy said he was satisfied. He said he was satisfied that day. He sure said it—Jesus knows he said it.

Q. What about his children? Did they seem to be satisfied?

A. They seemed to be satisfied; yes, sir."

The question presents itself, in this case, whether the deeds signed by the appellee and the one received by him are to be construed as a valid and sufficient family settlement. There are many cases in Arkansas, beginning with *Pate* v. *Johnson,* 15 Ark. 275, numerous others cited in *Pfaff, Adm.,* v. *Clements,* 213 Ark. 852, 213 S. W. 2d 356, and the recent case of *Hobbs* v. *Cobb,* 232 Ark. 594, 399 S. W. 2d 318,[2] which approve the doctrine of family settlement in the absence of fraud or mistake. There is no evidence of fraud or mistake in the case at bar. Family settlements are upheld in the absence of a pre-existing dispute. In the *Pfaff* case, *supra,* we said:

"It is not necessary that there be a previous dispute or controversy between the members of the family before a valid family settlement may be made. Thus, in *Martin*

---

[2] Also, see 38 A.L.R. 734, 739; 54 A.L.R. 977; 118 A.L.R. 1357; 15 C.J.S. Compromise and Settlement, § 3 (b) p. 715; 11 Am. Jur., Compromise and Settlement, § 11, p. 258.

v. *Martin, supra,* there was no dispute at the time of the conveyance or will in question, yet the agreement was called a 'family settlement'.'' [Citing cases]

The motive to distribute and settle amicably an estate is sufficient consideration for a family agreement. Quoting further from *Pfaff, supra*:

''Likewise, it is not essential that the strict mutuality of obligation or the strict legal sufficiency of consideration—as required in ordinary contracts—be present in family settlements. It is sufficient that the members of the family want to settle the estate; one person may receive more or less than the law allows; one person may surrender property and receive no *quid pro quo.*''

Appellee now contends that he is the sole and only heir of the testator and, therefore, that appellants have no interest in the property in question. In the early case of *Turner* v. *Davis,* 41 Ark. 270, it was claimed that Watkins did not have sufficient interest in the property to support a family settlement. There, Mr. Justice Eakin, speaking for the court, said:

''We cannot go behind the agreement to ascertain the interest of Watkins. It is a matter of no consequence whether he *had curtesy or had nothing.* It was a family contest concerning lands descended, between parties claiming antagonistic interests. The agreement stands on the ground of family settlements, which are as much encouraged and favored in equity, * * * they are supposed to be the result of mutual good will, and imply a disposition to concession for the purpose, regardless of strict legal rights; always excepting cases of fraud, of which nothing in this case appears.'' [Emphasis added]

The courts have also quickly approved family settlements where the question of legitimacy was involved. In *Bunel* v. *O'Day,* 125 Fed. Rep. 303, the question of legitimacy was an issue between a brother and a sister which resulted in a compromise settlement of the interests each claimed. In refusing to vacate this compromise and in approving it as a family settlement the court said:

"It is a wholesome rule of law, equally founded in sound public policy, that an amicable compromise of a litigation of the character of this should be favored by the courts. No matter if, on further investigation or subsequent development, it should appear that the defend knew at the time that the demand was not well founded in law or in fact, it would not affect the validity of the compromise. If fairly obtained, it should stand. 'The value consists in the release from an uncertain position, with its anxieties, from apparent danger, and from inevitable expenses and trouble.' " [Citing cases]

In *Strong et al* v. *Cowsen*, 197 Miss., 282, 19 So. 2d 813,[3] a partition deed was made between the parties to resolve the doubt about their respective inheritance rights because of a question of legitimacy. In refusing to cancel this partition deed, and upon approving it as a family settlement, notwithstanding the sufficiency of the proof established one of the parties was not a lawful heir, the court quoted with approval from 12 C.J. p. 322 as follows:

"* * *The termination of such controversies is considered a valid and sufficient consideration for the agreement, and the court will go further to sustain it than it would under ordinary circumstances. Accordingly, it has been laid down as a general rule that a family agreement entered into on the supposition of a right, or of a doubtful right, although it afterward turns out that the right was on the other side, is binding, and the right cannot prevail against the agreement of the parties."
The court further said:

"* * * there was something more than the mutual mistake of fact relied on herein that influenced the grantors in the execution of the deed here involved. They were likewise influenced by the desire to avoid the expense of litigation then thought to be necessary to determine the true facts, and by the uncertainties as to

---

[3] See also *Walker* v. *Walker*, 221 Miss. 225, 72 So. 2d 243; Carter's Succession, 149 La. 189, 88 So. 788; *Kam Chin Chun Ming* v. *Kam Hee Ho*, 371 Pac. 2d 379; *Smith* v. *Mogford*, 21 Week Rep. (Eng.) 472; *Stapilton* v. *Stapilton*, 1 Atk. 2, 26 Eng. Reprint. 1, 12 Eng. Rul. Cas. 100.

what the proof to be subsequently ascertained by an investigation and the litigation might disclose;''.

In our state family settlements of property rights will not be set aside except for very strong and cogent reasons. *Hollowoa* v. *Buck,* 174 Ark. 497, 296 S. W. 74. We find no such reasons to exist in the case at bar. These contending parties considered their claim, or the claim of the other, to be uncertain and doubtful and believed it expedient to adjust their differences and beliefs by these partition deeds and thereby set at rest the uncertainty and anxiety of their respective claims which are based upon the terms of the will and the question of their parentage. Family settlements tend to prevent litigation and uncertainty, and maintain peace and harmony even though the result reached is not what a court of justice might determine if its decision was first sought.

The affirmative relief sought by the appellants that these partition deeds be held valid and that title to the lands as described in them be quieted is granted. Therefore, the decree of the trial court is reversed and the cause remanded with directions to enter a decree in accordance with this opinion.