In the Matter of the ESTATE OF Samuel KRAUSE, Deceased.

Lloyd I. KRAUSE, as Executor of the Estate of Samuel Krause, and Lorraine Swanson, Plaintiffs and Appellants,

v.

Amanda KRAUSE, Defendant and Appellee.

No. 16290.

Supreme Court of South Dakota.

Argued April 25, 1989.

Decided July 5, 1989.

James A. Wyly of Richardson, Groseclose, Kornmann & Wyly, Aberdeen, for plaintiffs and appellants.

Kennith L. Gosch of Bantz, Gosch, Cremer, Peterson & Oliver, Aberdeen, for defendant and appellee.

SABERS, Justice.

Decedent's children appeal a judgment holding a family agreement unenforceable and distributing joint tenancy property to Amanda Krause (Amanda) as survivor.

### Facts

Samuel Krause (Samuel) was born in 1897. He married in 1921 and had two children by the marriage; Lloyd Krause (Lloyd) and Lorraine Swanson (Lorraine). Samuel farmed in North Dakota until 1943,

when he and his family moved to California. He moved back to North Dakota after the death of his wife in 1954. There he farmed 320 acres which he had purchased in 1946.

Amanda was born in 1905. She married in 1928 and had two children by the marriage; Merle Klein (Merle) and Lois Lenling (Lois). In 1948, Amanda and her husband purchased a home in Aberdeen, South Dakota, for $8,500. The mortgage was paid off in 1957. Amanda's husband died in 1953. After his death, Amanda renewed her teaching certificate and began teaching school to support herself.

Samuel and Amanda met in 1958 or 1959. They married on June 16, 1959. Samuel and Amanda opened a joint checking account with right of survivorship in either. Throughout their marriage, Samuel and Amanda worked together, pooled their assets, and placed their income in joint accounts and CDs. The major exception was the North Dakota farm held solely in Samuel's name.[1] Samuel and Amanda understood that this property would go to Samuel's children upon his death. To offset this, Samuel paid Amanda for her Aberdeen home and agreed that this money would go to Amanda's children. Amanda placed this and other money into CDs held jointly with her children.[2]

Samuel and Amanda continued to farm the North Dakota property. They purchased a small mobile home, lacking in modern conveniences, and lived in it during planting and harvest. Both Samuel and Amanda worked hard on the farm. The rest of the year Samuel and Amanda lived in the home in Aberdeen.[3] For additional income, Amanda took boarders into their Aberdeen home. The evidence showed that Samuel and Amanda were happy throughout their marriage.

In 1966, Samuel opened a safety deposit box in the First National Bank of Ellendale, North Dakota. Samuel held the box in his name and later added Lloyd's name. Amanda's name was not on the box and she was not allowed to see its contents. In 1973, Samuel made his last will and testament, which was kept in the box. Amanda did not know the terms of the will, nor that one had been made.

In February of 1979, Samuel suffered a stroke. The stroke left him physically disabled and prevented him from continuing to farm. Amanda chose to care for Samuel at home, rather than placing him in a nursing home. Following the stroke, Lloyd attempted to obtain a guardianship to take care of Samuel's financial affairs. Lloyd obtained a statement from Dr. A.C. Vogele, Samuel's treating physician, that Samuel was unable to take care of his financial affairs. However, Dr. Vogele admitted that he saw Samuel once a year or less and that those around Samuel would be better able to judge his mental competency. According to family members and friends Samuel was competent following the stroke until his death. Samuel flatly rejected Lloyd's proposal for a guardianship. Samuel and Amanda continued to manage their affairs until Samuel's death.

Samuel had a second stroke in October of 1980. However, Amanda continued to care for him. On October 28, 1985, Amanda fell down some steps and broke her hip. The injury required hospitalization and recovery in a nursing home. Due to Amanda's injury Samuel was also placed in a nursing home. On December 31, 1985, Amanda recovered sufficiently to return home in a wheelchair and made arrangements for Samuel to return home. Samuel returned home on January 2, 1986. He died suddenly on January 9, 1986.

Lloyd and Lorraine arrived in Aberdeen shortly after Samuel's death. Following

1. Samuel also had a small savings account in his name for the farm. Amanda's name was later added to this account and it was closed in 1983.

2. Amanda received money from an annuity following her first husband's death and another small inheritance. This was placed into the CDs held with her children. At the time of Samuel's death, the CDs were valued at approximately $68,000. An additional $5,000 from a life insurance policy on Samuel was placed in a CD after his death.

3. They deeded this property to themselves as joint tenants in 1963.

the funeral, Lloyd and Lorraine went to the Ellendale bank and opened Samuel's safety deposit box. They returned to Aberdeen that evening and read the will to Amanda. Article III of the will provided:

My wife, Amanda Krause, and I have the dwelling that we live in at Aberdeen and our checking and savings accounts in joint tenancy and we have agreed orally between us as follows: that after the payment of specific bequests as set forth in Article II of this, my Last Will and Testament, that ⅓ of the residue of the joint checking and savings accounts shall go to Amanda Krause and the other ⅔ of the balance remaining, Amanda Krause, my wife, agrees that this shall become a part of my estate and be disposed of as hereinafter set forth.

I, of course, understand that my wife need not do this because this property is in joint tenancy but I have enough faith in my wife to know that she will do as agreed upon. Further, I have a life insurance policy payable to her as beneficiary and she has agreed that this money shall be used by her for my funeral expense. Further I give, devise and bequeath to my wife, Amanda Krause, the house in Aberdeen that we live in; this house to be hers in fee simple. It is, of course, understood that this house is in joint tenancy and it is further understood that she may do with this house as she may desire when she inherits it from me. I further give, devise and bequeath to my wife the automobile that I may own at the time of my death and further, I give, devise and bequeath to my wife the household goods in the dwelling that we own at the time of my death.

The will provided that the remaining two-thirds of the joint tenancy accounts would be distributed one-third to Lloyd and one-third to Lorraine. Amanda stated that she had never made such an agreement with Samuel.[4]

The next day Lloyd and Lorraine met with Attorney Dan Diemert (Diemert) in Ellendale and reviewed Samuel's will. Diemert discussed the effect of the joint tenancy property and the conflicts which could arise from the will. He explained that the will would not, of itself, negate the right of survivorship and the burden would be upon them to show that there was no right of survivorship. Diemert suggested a "family agreement" to avoid an expensive court battle. That evening, Lloyd and Lorraine returned to Amanda's home. Amanda's son Merle was also present. A discussion ensued concerning the will and part of the conversation with Diemert. Though Lloyd understood that the jointly held property could pass to Amanda outside the will, this was not discussed with Amanda. Instead, Lloyd suggested that if the will was unsatisfactory to Amanda, they should draw up a family agreement to distribute the property. He proposed a settlement which would distribute the property similar to the will, except that Amanda would receive one-half the joint accounts, rather than the one-third under the will.[5] The discussion continued until 4:00 in the morning. Lloyd pressured Amanda to sign the proposed agreement that night, but she refused.

After only a few hours of sleep, Amanda and Merle went to see Attorney Bill Hyde (Hyde). Amanda sought advice on the agreement proposed by Lloyd. There was evidence that Hyde should have known that the accounts were in joint tenancy with right of survivorship in Amanda. However, Hyde's testimony and notes from the conference show that he assumed the ac-

---

**4.** Lloyd argues that Amanda admitted on cross-examination that she also said "He can't do that, that's my money." Even assuming the statement was made in that context does not indicate that she understood right of survivorship and the impact of the will upon survivorship rights. In fact, the statement could be interpreted as one of disbelief.

**5.** During their discussion, the parties placed the following values on the estate assets:

North Dakota Land $100,000; House held in joint tenancy $40,000; an undivided one-half interest in the car $2,000; an undivided one-half interest in the furniture $3,000; CDs held in joint tenancy $120,000.

Lloyd believed the CDs were worth more. The actual value of the jointly held accounts and CDs was $117,045.26.

counts were not in joint tenancy and advised Amanda under that assumption. Hyde explained to Amanda that she would receive slightly more under the family agreement than if she repudiated the will and chose to take her elective share. He did not advise Amanda concerning the effect joint tenancy would have on the distribution.

Later that morning, Lloyd came to Hyde's office and hired Hyde to draw up the family agreement consistent with the proposal Lloyd had drawn up the prior evening. Lloyd told Hyde that things must be done quickly and hurried him to draw the agreement. Later in the day, Lloyd obtained a copy of the agreement drawn up by Hyde. The next morning Lloyd took the agreement to another attorney in Aberdeen. The attorney reviewed the draft and discussed its enforceability with Lloyd. Lloyd also took a draft of the agreement to Attorney Diemert for review. After several changes and revisions, the agreement was taken to Amanda's home where she signed it that same evening. Neither Amanda nor Merle received additional advice from Hyde or any other attorney after their initial conversation.

Approximately one month later, Amanda was advised by her sister that property held in joint tenancy passes to the surviving owner regardless of any will terms. Amanda and Merle researched this and found Amanda's sister to be correct. Amanda and Merle went to see Attorney Hyde who confirmed their conclusion. Prior to this time, Amanda had no knowledge that the joint tenancy property might survive in spite of the will terms.

Hyde informed Attorney Diemert by letter that Hyde could no longer represent Lloyd. He stated that Amanda intended to rescind the family agreement because it was obtained through mistake and fraud, and duress. On May 27, 1986, Samuel's will was admitted to probate. Lloyd was named executor. Amanda filed several motions which, among other things, requested distribution to her of the assets held in joint tenancy between her and Samuel. On August 14, 1987, Lloyd and Lorraine filed

an action under SDCL 21–24–5 seeking to uphold the validity of the family agreement. In the alternative, the complaint requested the court to declare 1) that Samuel did not intend for the jointly held property to carry a right of survivorship in Amanda, or 2) that Amanda wrongly obtained the joint accounts and held them in constructive trust for all the heirs.

Following a court trial, the court held the family agreement unenforceable because of mistake of fact and mistake of law on the part of Amanda. The court further held that Amanda was entitled to all the accounts held in joint tenancy between her and Samuel. Lloyd and Lorraine appeal. We affirm.

### 1. *Enforceability of the family agreement.*

■ We have upheld the use of family agreements for the distribution of the property of a decedent. *Miller v. Thode,* 372 N.W.2d 459 (S.D.1985); *Neuharth v. Brunz,* 85 S.D. 267, 181 N.W.2d 92 (1970); *Moncur v. Jones,* 72 S.D. 202, 31 N.W.2d 759 (1948); *In Re Vasgaard's Estate,* 62 S.D. 421, 253 N.W. 453 (1934). Such agreements are favored where disputes arise in the settlement of a decedent's estate. *Neuharth, supra; Vasgaard, supra.* As stated in *Vasgaard:*

[I]t is held that family agreements relative to the distribution of property of a decedent among the persons thereto entitled are not contrary to public policy and if fairly made are binding and enforceable according to their terms; and indeed it is frequently said that the law looks with particular favor upon such family compromises. To that view this court is already committed and has refused to recede therefrom.

*Id.,* 253 N.W. at 456. However, family agreements are subject to the rules of contract formation and may be rescinded if consent thereto is improperly obtained.

■ The trial court found that this family agreement was unenforceable because of a unilateral mistake of law. SDCL 53–4–10 provides in part:

A mistake of law in relation to consent to contract constitutes a mistake resulting

in voidable consent only when it arises from:

. . . . .

(2) A misapprehension of the law by one party of which the others are aware at the time of contracting, but which they do not rectify.

The statute sets out two elements necessary to make a contract voidable for a unilateral mistake of law. The party seeking to rescind the contract must show 1) that the party was under a misapprehension of the law at the time of entering into the contract; and 2) the other parties were aware of this misapprehension and did not rectify it.

The trial court concluded that Amanda did not know the legal effect of joint tenancy with right of survivorship. The record shows there was no discussion that the accounts were held in joint tenancy with right of survivorship during the negotiations between Amanda, Lloyd, and Lorraine. The only legal advice Amanda received prior to signing the agreement was from Attorney Hyde. Hyde, Amanda, and Merle each testified that Hyde did not advise Amanda concerning the effect of joint tenancy. The notes Hyde made during the conference support this testimony. The court found Hyde did not know that the accounts were held in joint tenancy when he spoke with Amanda and did not inform her of the effect of joint tenancy. The court also found that the first Amanda knew the jointly held property would pass outside the will was when she spoke to her sister several weeks after signing the family agreement. The trial court must be given deference to determine the credibility of the witnesses and we may not reverse findings of fact unless they are clearly erroneous. *In Re Estate of Althen,* 429 N.W.2d 745 (S.D.1988). These findings are supported by the evidence and the trial court properly concluded that Amanda was acting under a misapprehension of the law.

The court also found that Lloyd and Lorraine were aware of Amanda's mistake. Lloyd claims that if Amanda was operating under a misapprehension of the law he was not aware of it. Lloyd testified at trial that he was unaware of Amanda's mistake at the time of making the agreement. He claims that he believed Amanda was aware of her rights because she received legal advice prior to signing the agreement. The trial court rejected Lloyd's testimony and concluded that he was aware of Amanda's mistake and did not attempt to rectify it. Lloyd was fully advised by Diemert of the limited effect the will had on jointly held property. There is no testimony that Lloyd ever discussed with Amanda her survivorship rights in the joint tenancy property. In fact, there was testimony that at one point Lorraine began to mention the joint accounts, but was quickly cut off by Lloyd.

It is undisputed that Lloyd knew, absent an agreement, he could not obtain any of the joint tenancy property without lengthy litigation. Knowing this, he hurried Amanda to sign the agreement. It would seem strange that Amanda would be willing to sign an agreement giving up one-half of the joint tenancy accounts if she had any idea she was entitled to all of them. It is clear that had Amanda not operated under the mistake of law she would not have entered into the agreement. Under these circumstances, the trial court properly concluded that Lloyd was aware of the mistake and did not attempt to correct it. Accordingly, there was no meeting of the minds and the agreement was voidable under SDCL 53–4–10(2).

The trial court also concluded that the agreement was voidable for mistake of fact. Having determined that the agreement is voidable for mistake of law, we deem it unnecessary to discuss whether there was an unilateral mistake of fact.

### 2. *Distribution of the accounts in joint tenancy.*

Lloyd claims that even if the family agreement is voidable, Amanda is not entitled to the joint accounts. He argues that Amanda exerted undue influence over Samuel following his stroke and placed his property into jointly held accounts which she could receive upon his death. Lloyd also claims that the will and other circumstances show that Samuel did not intend

the joint tenancy accounts to include right of survivorship.

### a. *Undue influence.*

■ Lloyd argues that a confidential or fiduciary relationship existed between Samuel and Amanda which she abused by exerting undue influence over him. He argues that as a result all the jointly held accounts and CDs should be held by Amanda in constructive trust. 76 Am.Jur.2d *Trusts* § 228 (1975). He also claims that Amanda placed Samuel's assets into joint accounts after Samuel became incapacitated from the stroke. These claims do not accurately reflect the situation between Samuel and Amanda.

The trial court found that Samuel maintained his mental faculties after the stroke. Though Amanda performed many of the physical duties because of Samuel's physical disability, the evidence supports the court's finding that Samuel continued to participate in the financial decisions. Further, throughout their marriage Samuel and Amanda worked together and pooled their assets. Contrary to Lloyd's assertion, Amanda was not placing "Samuel's" money in joint accounts, but rather it was "their" income. The record does not indicate that Amanda did anything different after the stroke than they had been doing throughout their marriage. There is no evidence that Amanda placed funds into the CDs held with her children. Concerning constructive trusts, this court has stated:

> [W]hen one uses a confidential relation to acquire an advantage which he ought not in equity and good conscience to retain, the court will convert him into a trustee, and compel him to restore what he has unjustly acquired or seeks to unjustly retain[.]

*Jaeger v. Sechser,* 65 S.D. 38, 41–2, 270 N.W. 531, 532 (1936). Unlike the position urged by the dissent in *In Re Estate of Jahnel,* 428 N.W.2d 528, 533 (S.D.1988), there is no evidence in this case that Amanda wrongfully acquired property belonging to Samuel.

### b. *Right of survivorship.*

■ A financial account opened in joint tenancy with right of survivorship creates a rebuttable presumption that the depositor intended survivorship rights. *Kirsch v. First Nat'l Bank of Watertown,* 298 N.W.2d 71 (S.D.1980). Evidence of a contrary intent must be clear and satisfactory. *Miles v. Hanten,* 83 S.D. 635, 164 N.W.2d 601 (1969); *Wagner v. Wagner,* 83 S.D. 565, 163 N.W.2d 339 (1968). This is a question of fact and we will not reverse the trial court's findings unless they are clearly erroneous. *Kirsch, supra; Miles, supra.*

■ Lloyd claims that the trial court erred in finding there was not clear and satisfactory evidence to rebut the right of survivorship. He lists several factors which he claims show sufficient intent to rebut the right of survivorship in the joint accounts. First, he argues that the will shows an intent on Samuel's part that the right of survivorship should not apply. Second, he claims that Amanda placed the assets into joint accounts while Samuel was incapacitated. Third, he claims that a substantial share of the money in the joint accounts was income from Samuel's assets.

While Article III of Samuel's will could arguably indicate an intent to avoid right of survivorship, other language in Article III indicates otherwise. After dividing the property one-third to Amanda; one-third to Lloyd; and one-third to Lorraine, the will states "I, of course, understand that my wife need not do this because this property is in joint tenancy...." This language indicates that Samuel intended right of survivorship but knew the will could not overcome her right of survivorship unless Amanda so agreed. Further, as discussed above, Lloyd's claim that Amanda placed "Samuel's" money into joint accounts after his incapacity is not accurate. Samuel and Amanda were married for almost twenty-seven years, during which they worked and managed their finances together. If anything, the circumstances of this case indicate that Samuel and Amanda intended right of survivorship in the jointly held assets. There is not clear and convincing evidence to rebut the presumption that the

jointly held assets carried right of survivorship. *Kirsch, supra; Wagner, supra.* Accordingly, we affirm the trial court.

All the Justices concur.