In the Matter of the ESTATE OF Edward Miller GRIMM, Deceased.

Maxine Tate GRIMM, individually and as Supervised Personal Representative of the Estate of Edward Miller Grimm;

Linda Grimm; Edward Miller Grimm II; and E. LaVar Tate, as Supervised Personal Representative of the Estate of Edward Miller Grimm, Plaintiffs and Appellants,

v.

Ethel Grimm ROBERTS, Rex Roberts, Juanita Grimm Morris, and Juanita Kegley Grimm, Defendants and Respondents.

No. 880708–CA.

Court of Appeals of Utah.

Dec. 20, 1989.

Daniel L. Berman (argued), Patricia A. O'Rorke, Peggy A. Tomsic, and Blake S. Atkin, Salt Lake City, for plaintiffs and appellants.

Harold G. Christensen, R. Brent Stephens (argued), Snow, Christensen & Martineau, and Craig S. Cook, Salt Lake City, for defendants and respondents.

M. David Eckersley (argued), Salt Lake City, for Juanita Kegley Grimm.

## OPINION

Before BILLINGS, GARFF, JJ., and CROFT [1], Senior District Judge.

BRYANT H. CROFT, Senior District Judge:

Plaintiffs (appellants) appeal from a final judgment of the district court entered April 25, 1986. Defendants (respondents) cross-appeal from that portion of the judgment denying them attorney fees.

### Facts

This litigation had its origin in the probate of two wills referred to as the Philippine will and the non-Philippine will, both executed on January 23, 1959, by Edward Miller Grimm [2] ("Grimm"), who died on November 27, 1977. Grimm, a United States citizen, resided mainly in the Philippine Islands, although he had a secondary residence in Tooele County, Utah, and extensive business and property holdings both in

---

1. Bryant H. Croft, Senior District Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(10) (Supp.1989).

2. In January 1966, Grimm executed codicils to both wills, the provisions of which related to disposition of his property in the event he and Maxine, or they, Pete and Linda, should all die in a common disaster. Such did not occur and the codicils are not relevant to the issues of this case.

the Far East and in the western United States.

At the time of his death, Grimm was survived by his wife, Maxine Tate Grimm ("Maxine"), whom he married on June 25, 1947, and their two children, Edward Miller Grimm II ("Pete") and Linda Grimm ("Linda"). Maxine, Pete, and Linda are the appellants in this action. Grimm was divorced from his first wife, Juanita Kegley Grimm ("Juanita"), in Reno, Nevada, by a decree entered June 2, 1947. Two daughters were born of this marriage, Ethel Grimm Roberts ("Ethel") and Juanita Grimm Morris ("Nita"). Nita, Ethel, and Ethel's husband, Rex Roberts, are the respondents in this action.

The Philippine will governed all of Grimm's property situated in the Philippines. It named Maxine, Charles Parsons ("Parsons"), and Byron S. Huie ("Huie") as co-executors, noting that Parsons and Huie both resided in Manila. It declared his Philippine properties community property, and directed the executors to deliver to Maxine that portion thereof which under the Philippine laws constituted her share of the community property. It also bequeathed to Maxine his cars, furniture and furnishings, musical instruments, jewelry and clothing situated in the Philippines at the time of his death. He named his four children, Pete, Linda, Ethel and Nita, and directed that the residue of his Philippine estate be distributed according to Philippine "legitime" or compulsory heir law. This division resulted in Ethel and Nita each being entitled to 3.7% of the Philippine estate. As to that portion of his Philippine estate over which he had the power and freedom of testamentary disposition under Philippine law, he bequeathed 16% to two sisters and a brother and 84% to Maxine, Linda, and Pete in equal shares.

The non-Philippine will purported to dispose of his property, both real and personal, not situated in the Philippines. Under this will, Maxine received all real property located outside the Philippines. Grimm be-

queathed the remainder of his non-Philippine estate 50% to Maxine and 25% to each of Linda and Pete. Grimm in his will stated he was purposely making no provision for Nita and Ethel, because he had provided for each of them in a separate will disposing of "his Philippine property." This will named Maxine and E. LaVar Tate ("Tate") as co-executors.

Both wills contained the following spendthrift clause:

No beneficiary of my estate shall have any right to alienate, encumber, or hypothecate his or her interest in said estate or the income therefrom, nor shall such interest of any beneficiary be subject to claims of his or her creditors or liable to attachment, execution, or other process of law.

On July 19, 1977, Grimm executed a trust agreement naming Pete as trustee. We discuss the details of this trust when dealing with its legal effect. In August of 1977, Grimm executed 42 assignments of property interests to Pete "as trustee."

After Grimm's death, the relations between the two branches of his family became strained, due in part, at least, to the emergence of the trust agreement. Lawyers were retained by both factions, and conflicts, including tax issues, arose that needed resolution.[3] Ethel, under proceedings initiated on December 29, 1977 in Philippine court, had herself appointed special administratrix, alleging that Grimm had died intestate. This appointment became another source of conflict among the parties.

Finally, after extensive and continuous negotiations, a Family Settlement Agreement ("FSA") was executed on April 25, 1978 by Maxine, Linda, and Pete as First Parties and Juanita, Nita, and Ethel as Second Parties.

The FSA consisted of two documents: the Agreement and a Supplemental Memorandum. The Agreement provided that

---

**3.** One such question related to the validity of Grimm's 1947 Nevada divorce from Juanita and hence the validity of his marriage to Maxine. The record discloses that Grimm commenced

the Nevada divorce action but Juanita appeared, answered, and counterclaimed for divorce, and was in fact awarded the decree of divorce from Grimm.

Grimm's estate included all property owned by Grimm at the time of his death and all property that Maxine had or claimed to have under any community property laws; that from the estate there was to be set apart a "marital share" for Maxine as defined therein, which in no event was to be less than $1,500,000 plus the home in the Philippines and the home in Tooele County. The "net distributable estate" was defined as all of the estate available for distribution after deducting the marital share and all debts of Grimm, claims against the estate, expenses of administration, all inheritance and estate taxes, all bequests to Grimm's sisters and brother, accounting and legal fees incurred in administering the estate, and certain other enumerated items. The net distributable estate was to be shared equally by Linda, Pete, Nita, and Ethel.

The Supplemental Memorandum provided that any property transferred to Pete as trustee under the trust Agreement of July 12, 1977, would be included in the estate of Grimm. It also specifically identified which bank accounts were or were not to be included in the net distributable estate defined in the Agreement.

Litigation over the FSA was triggered when Ethel and Nita filed a petition in the probate case seeking the removal of Maxine and Tate as personal representatives for failure to move the probate proceedings forward. In response, appellants filed a 13–count civil action against respondents on September 10, 1980, to which respondents filed an answer.[4]

In summary, respondents below contended the settlement agreement should be enforced and implemented. Appellants, in twelve claims for relief, generally alleged that the FSA should be declared void, unenforceable, of no effect, and rescinded. Each claim sets forth its own allegations to support that goal. The validity of the FSA was the major issue of this case. However, appellants also claimed intentional infliction of emotional distress.

Trial in the case was set for August 6, 1985. Appellants filed a demand for jury trial, and respondents objected. Respondents contended appellants were not entitled to a jury trial as their claims were equitable. Appellants argued their claims for compensatory and punitive damages, and particularly the one for intentional infliction of emotional distress, asserted legal claims necessitating a jury decision.

The court ruled that plaintiffs would be given the benefit of having a jury, but stated: "So that everybody understands, the court will make the decision as to whether or not the FSA is valid or invalid," and then based upon that decision, if defendants pursue their counterclaim, the plaintiffs could not contend they didn't have the right for the jury to hear all of the defenses "with regard to coercion, distress, and other defenses."

After a ten-day trial in August 1985, the court ruled in favor of respondents and entered its findings of fact and conclusions of law on April 25, 1986.

By its judgment, the court ruled (1) the FSA was a valid and binding agreement; (2) that it was just and reasonable and, to the extent approval of the court was necessary, it was approved by the court; (3) the estate was to be distributed in accordance with the FSA. Respondents' claim for attorneys' fees was denied. This appeal and cross-appeal followed.

## Issues on Appeal

We must resolve the following issues on appeal:

1. Whether the court erred in ruling the FSA was a valid and binding agreement;

2. What effect, if any, does the Trust Agreement have upon the validity of the FSA?

3. Could the court approve the FSA under Utah Code Ann. 75–3–1102(1)(c) (1978) without notice to two co-executors of the Philippine will?

---

**4.** Also on September 10, 1980, appellants filed an 11–count counterclaim to the removal petitions, said 11 counts being identical to 11 of the 13 counts in the civil case. The case as tried involved a consolidation of the two cases.

4. Were appellants entitled to a jury trial on the affirmative defenses of duress and failure of consideration asserted in response to respondents' counterclaim or upon appellants' claim for damages for intentional infliction of emotional distress?

5. Whether the court's findings and conclusions were fundamentally inadequate.

6. Did the court err in denying an award of attorney fees to respondents?

### Validity of the FSA

▬ The fundamental issue presented is whether the FSA is enforceable even though it was not formally approved by the court before appellants' repudiation. Appellants contend that under the "plain language of Utah Code Ann. § 75–3–1101" and "settled authority," the FSA could be repudiated at any time prior to court approval. They claim they repudiated the FSA when they filed their counterclaim to the removal petition filed by Ethel and Nita and their complaint in the civil case. Appellants stress that respondents did not in their pleadings at any time prior to respondents' filing their counterclaim in 1985 [5] seek or receive court approval of the FSA.

Utah Code Ann. § 75–3–1101 (1978) provides:

A compromise of any controversy as to ... the rights or interests in the estate of the decedent, ... if approved in a formal proceeding in the court for that purpose, is binding on all the parties thereto, including those unborn, unascertained, or who could not be located. An approved compromise is binding even though it may affect a trust or an inalienable interest.

Appellants cite *In re Estate of Chasel*, 725 P.2d 1345, 1348 (Utah 1986) for the proposition that "compromise agreements authorized by Part 11 of the Probate Code must be approved in formal proceedings."

However, the quoted language is clearly dictum. In *Chasel*, the court had already approved the settlement agreement. It was only when Chasel, after finding three previously unknown wills, moved to set aside the compromise agreement that the court refused to reopen the issue. The Supreme Court stated he could not reopen the probate because section 75–3–1101 stated that a compromise agreement, "if approved in a formal proceeding in the court for that purpose, is binding on all the parties thereto." The court did not decide the issue as to whether or not a FSA not approved by the court was binding upon the parties to the compromise agreement, the issue present here.

We do not read Part 11 of the Probate Code as "authorizing" compromise agreements, but rather as authorizing "approval in formal probate proceedings" of such agreements in the manner set forth in section 75–3–1102, with the result that an approved agreement is binding even on interested persons not party to it. However, section 75–3–1101 does not invalidate an otherwise valid compromise agreement between the parties prior to court approval.

This position is further supported by Utah Code Ann. § 75–3–912:

Subject to the rights of creditors and taxing authorities, competent successors may agree among themselves to alter the interests, shares, or amounts to which they are entitled under the will of the decedent, or under the laws of intestacy, in any way that they provide in a written contract executed by all who are affected by its provisions.

This section does not require that such an agreement must be submitted to the probate court for its approval.

The Michigan case of *In re Peck's Estate*, 323 Mich. 11, 34 N.W.2d 533 (1948) is further authority to support the trial court's conclusion that the settlement agreement was binding between the parties

---

**5.** Appellants' brief fixes the date of filing of respondents' counterclaim as February 9, 1985, some "four years" after their repudiation of the FSA. The probate case file shows respondents filed their counterclaim on August 10, 1983, together with their amended petition for removal of Maxine and Tate as personal representatives. The civil case file shows a copy of it was not placed in that file until July 29, 1985.

without court approval. In that case, a controversy developed between decedent's widow and the trustee of the estate. The parties entered into a settlement arrangement that was never approved by the probate court. The Supreme Court of Michigan nevertheless enforced the agreement, stating:

> It was not necessary to secure the consent of the probate court to the settlement as there were no minors or unknown heirs involved. The court encourages settlements where there is no fraud or mistake and the parties are of age, particularly so where there is a full understanding of the provisions in the settlement and the parties are represented by able counsel.

Id., 34 N.W.2d at 538. The court further found: "[The probate code] does not prevent settlement of controversies by parties legally competent to act in their own behalf."[6]

In further support of respondents' position, an annotation states:

> In accord with the general policy of law which favors the compromise of controversies and the avoidance or termination of litigation [citing 15 Am.Jur.2d, Compromise and Settlement, § 4] it is said that the law looks with favor upon an agreement of compromise among members of a family which avoids a will contest or promotes the settlement and distribution of the testator's estate, or, as it is sometimes stated, that such agreements are favorites of the law.[7]

Where all the persons interested in the estate of a testator as heirs or beneficiaries under the will are legally competent to contract, they may settle controversies by agreement and need not seek the approval of the court under the statute.[8]

Section 75–3–1102 does not require court approval for a settlement to be binding upon its signatories. It merely outlines the procedures for securing court approval of a compromise in order for it to bind those not before the court.

■ Appellants further argue duress as grounds for declaring the FSA to be void. In the weeks preceding execution of the FSA both sides were represented by able counsel. Maxine retained David Salisbury as her attorney while she was in Utah. He was advised by Maxine that while some basic agreements with respondents had been reached in the Philippines, she wanted him to draft the FSA. In correspondence, she said she no longer felt pressured. Salisbury spent many hours negotiating with Donald Holbrook as counsel for respondents. Pete, being in Utah and conferring with Salisbury, was granted a power of attorney by Maxine in order to act on her behalf. The prolonged and extensive assistance of counsel by both sides rebuts appellant's contentions that the FSA was a product of duress. We do not find the trial court's ruling on the issue of duress clearly erroneous.

---

**6.** The first sentences of the Michigan statute and Utah Code Ann. § 75–3–912 are identical. Michigan did not enact separate statutes such as sections 1101 and 1102. But The balance of the Michigan statute provides that where interested parties include minors or incapacitated persons, after notice, the probate court may, if the agreement is made in good faith and appears just and reasonable for such persons, direct the representative of the person or interest to sign or enter into the agreement. Utah Code Ann. § 75–3–1101 makes the court approval binding on all parties thereto, including those unborn, unascertained, or who could not be located. Section 75–3–1102 sets out the method to obtain court approval, including parents executing the agreement on behalf of a minor child, and states that after notice, the court may, if it finds the contest or controversy is in good faith and

that the effect of the agreement upon interests of persons represented by fiduciaries or other representatives is just and reasonable, make an order approving the agreement and directing all fiduciaries under its supervision to execute the agreement. The Editorial Board Comment for sections 75–3–1101 and –1102 of the Utah Uniform Probate Code states that they are modeled after section 93 of the Model Probate Code "Comparable legislative provisions have proved quite useful in Michigan." We are persuaded that *In re Peck's Estate* is in point despite slightly different language in the statutes.

**7.** Annotation, *Family Settlement of Testator's Estate,* 29 A.L.R.3d 8, 25, 125 (1970).

**8.** *Id.* at 125.

■ Appellants also claim lack of consideration as a basis for declaring the FSA void. However, respondents answer that consideration consisted of good faith issues that blocked disposition of Grimm's estate, and which were compromised as part of the FSA: whether the 42 assignments to Pete as trustee of Grimm's assets were valid as to execution and delivery; whether the Internal Revenue Service and/or the Philippine taxing authorities had all the facts for determining the estate's tax liability, which was finally settled and paid after execution of the FSA; difficulties that confronted the parties in dealing with Parsons (Grimm's partner) and reaching an agreement with him as to the estate's interest in companies in which they were jointly involved, and whether Juanita's divorce from Grimm and Maxine's marriage to him were valid.

We agree that a legitimate controversy as to what assets constitute the Philippine estate existed. Grimm had assigned 42 interests to Pete as trustee one month after the trust agreement was executed, which, if upheld, would have very substantially reduced the Philippine estate to which Ethel and Nita were partially entitled.[9] Each asset was assigned to Pete "as trustee." No mention was made of the trust agreement executed in July, 1977, nor of any terms and conditions applied to the assets so assigned.

In G. Bogert, *Law of Trusts*, § 11 at 24 (5th ed. 1973), it is stated:

> Even if the intent to create a trust is assumed, it cannot be effective unless certain essential trust elements are properly described, namely, the subject matter, the trust purpose, and the beneficiaries.

In *Sundquist v. Sundquist*, 639 P.2d 181, 184 (Utah 1981), the Supreme Court said that in the creation of a trust, the trust property must be clearly specified and set aside, and the "essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the *sine qua non* of a trust relationship."

Standing alone, it is not clear that the properties described in the assignments were intended to become part of the trust estate created by the trust agreement of July, 1977, nor that they are subject to the restriction on alienation contained in the spendthrift clause of that agreement. We have no need to decide such questions, but only whether they present a good faith issue with respect to the issue of consideration for the FSA.

The Supreme Court of Utah has stated in several cases that consideration for an accord may consist of a compromise of a bona fide dispute which is not necessarily well-founded but is in good faith. *E.g., Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730 (Utah 1985); *Sugarhouse Finance Co. v. Anderson*, 610 P.2d 1369 (Utah 1980); *Ashton v. Skeen*, 85 Utah 489, 39 P.2d 1073 (1935). In *Sugarhouse Finance*, the court stated:

> No completely satisfactory and comprehensive definition of consideration has ever been devised. It is generally agreed, however, that where a promise is supported by the incurrence, on the part of the promisee, of a legal detriment in order to confer a benefit on the promisor, such is sufficient to serve as consideration, thereby rendering the promise legally enforceable.... [C]onsideration is often found in the obligor's agreement ... to surrender the assertion of a legally enforceable right.

610 P.2d at 1372 (footnotes omitted).

The trial court found respondents asserted in good faith the possible invalidity of the trust, possible invalidity of Grimm's divorce, and the effect of the application of Philippine laws; that mutual promises for the sake of family harmony constituted consideration; that the parties were united in dealing with taxing authorities and with Parsons; that the Philippine estate tax was reduced by making it unnecessary for Ethel and Nita to assert that the entire estate (except for real property in Daggett County) was subject to distribution and taxation

---

**9.** If these assignments were valid, the only assets remaining in the Philippine estate appear to be a receivable from Everett Steamship Company consisting of three payments of $984,092.31 each, due June 30 in each of the years 1978, 1979, and 1980, and any Philippine real estate.

under Philippine law; and that respondents did not know that whether the claims they asserted were unfounded. We conclude that the trial court's finding of a consideration to support the FSA, from our review of the record, was not clearly erroneous.

In summary, we find the FSA is a valid contract and does not require court approval under sections 75–3–1101 and –1102. We further find that in the absence of illegality, fraud, duress, undue influence, or mistake, it was not subject to repudiation by appellants. *Chasel*, 725 P.2d at 1345. The FSA was a compromise of a probate dispute. The issue as to its validity was clearly equitable, and thus for the court to decide. The court's findings will be upheld on appeal unless clearly erroneous. Utah R.Civ.Pro. 52(a); *In re Estate of Bartell*, 776 P.2d 885 (Utah 1989); *Bailey v. Call*, 767 P.2d 138, 139 (Utah App. 1989). The record does not support any finding of illegality, fraud, duress, undue influence, or mistake such as would justify repudiation. Furthermore, from a thorough review of the record, we do not find the court's ruling in respondents' favor with respect to appellants claims of fraud, unjust enrichment, failure to obtain signatures of persons "affected" by the FSA, breach of duty by Ethel under the probate proceedings in the Philippines, and breach of the FSA, to be clearly erroneous.

### Effect of the Trust Agreement on the FSA

▮ Appellants allege the Supplemental Agreement of the FSA expressly provides that any property transferred to the trustee pursuant to the trust would be included in the estate of the decedent for the purposes of the FSA and that this provision, if enforced, would have the effect of destroying decedent's intent as to disposition of his estate under the trust.

Appellants claim the law is clear that beneficiaries may not alter or terminate a trust if it would frustrate a material purpose of the trust;[10] that case law holds that a court with statutory power to approve a FSA will not do so if it terminates or materially alters a spendthrift trust; and that under such cases the court should have rejected the FSA because it terminated or materially altered the spendthrift trust. In candor, appellants acknowledge the Restatement Second of Trusts adopts a modified rule to the effect that an agreement to modify a spendthrift trust will not be effective to terminate the trust unless approved by the court as for the best interests of a beneficiary. They then set forth some reasons why it would not be for their best interests and say the court made no finding that would support court approval under the "best interest" standard.

Respondents assert that the cases cited are in accord with the general rule of law applying to trusts, but are inapplicable to this case because: (1) The trust is illusory and contains few assets; (2) Appellants renounced any interest in the trust and are estopped from utilizing it to avoid the FSA; (3) Section 75–3–1101 specifically allows a FSA to be binding even if it affects a trust or inalienable interest; (4) It was in the best interests of appellants as beneficiaries to enter into the FSA.

We have found the FSA to be a valid contract, even without court approval. However, the trial court in its judgment approved the FSA. Under Section § 75–3–1101, it is thus binding, even though it may affect a trust or an inalienable interest.

### Lack of Notice to Parsons and Huie

The record before this court shows that this issue is raised by appellants for the first time in their brief on appeal. The allegations of the eighth, ninth, and tenth causes of action with respect to failure to give notice to interested parties contain no mention of Parsons or Huie. In accord with established case law, we do not further consider this issue.[11]

10. *Sundquist v. Sundquist,* 639 P.2d 181 (Utah 1981).

11. *Jolivet v. Cook,* 784 P.2d 1148, 1151 (Utah 1989); *Zion's First Nat'l Bank v. National Ameri-* can Title Ins. Co., 749 P.2d 651, 654 (Utah 1988); *Salt Lake City Corp. v. James Constructors, Inc.,* 761 P.2d 42, 46 (Utah App.1988).

### Jury Trial

■ Appellants asserted duress and failure of consideration as grounds to find the FSA invalid and unenforceable. Appellants contend they were entitled to have these issues decided by a jury because duress and lack of consideration were asserted as affirmative defenses to respondents' counterclaim seeking court approval of the FSA and damages. We disagree. Respondents put on no evidence in support of their claim for damages in their counterclaim, and hence, such affirmative defenses became moot.

Count eleven of appellants' complaint alleged a claim for damages on behalf of appellants for the intentional infliction of emotional distress. Such conduct, if proven, constitutes a tort.[12]

In *Samms v. Eccles,* 11 Utah 2d 289, 358 P.2d 344, 346–47 (1961), the Supreme Court stated:

An action may be maintained for severe emotional distress, though not accompanied by bodily impact or physical injury, where the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable persons would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

(footnote omitted). *Samms* is cited in *Gygi v. Storch,* 28 Utah 2d 399, 503 P.2d 449, 450 (1972), wherein our Supreme Court quoted comment h to section 46 of the Restatement (Second) of Torts, as follows:

It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

In comment j of section 46 it is stated that:

The rule stated in this section applies only where the emotional distress has in fact resulted, and where it is severe.... It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises.... The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.... It is for the court to determine whether, on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

■ In support of her claim, Maxine made the following allegations: While at the hospital during Grimm's final illness, Ethel threatened that unless Maxine had Grimm execute a new will, she would cause trouble. (Maxine retained a Utah law firm in an effort to satisfy Ethel's demand). Rex told Maxine the 1947 divorce between Grimm and Juanita was invalid and thus her marriage to Grimm was thus illegal, and they would commence court proceedings to so establish. Ethel and Rex broke into Maxine's house and removed certain personal property, including a safe, which they refused to return unless Maxine signed the FSA. Without telling Maxine, Ethel tried to gain control of the estate by having herself appointed special administratrix in the Philippine court through a "perjurious" petition in which she alleged Grimm died intestate and declaring that she was the only heir in the Philippines and refused to release such appointment unless Maxine signed the FSA. Ethel and Rex threatened to cause trouble with the taxing

---

**12.** In Restatement (Second) of Torts § 46 comment b (1965) it is stated that "[i]t is only within recent years that the rule stated in this section [on emotional distress] has been fully recognized as a separate and distinct basis of tort liability. That section states as an element of the tort of causing severe emotional distress that the conduct be "extreme and outrageous."

authorities and to interfere with a determination of Grimm's relationship with Parsons. Rex and Ethel continually pressured and harassed Maxine in March 1978 and entered Maxine's home unannounced, where Ethel swore and screamed at Maxine. They repeated such threats and demands, which were emotionally and physically devastating to Maxine, resulting in hospitalization. Even after the signing of the FSA, Rex and Ethel continued their personal attacks against Maxine, resulting in a second hospitalization.

The court ruled that appellants were not entitled to recover damages on their claim for intentional infliction of emotional distress. In so doing, the court took that legal claim from the jury, in effect, directing a verdict. Therefore, we view the evidence in the light most favorable to the party against whom the verdict is directed, and sustain the ruling only if there is no evidence or reasonable inferences to be drawn therefrom to support an essential element of the claimant's prima facie case. *Little America Refining Co. v. Leyba*, 641 P.2d 112, 114 (Utah 1982); *Gleave v. Denver & Rio Grande Western Railroad Co.*, 749 P.2d 660 (Utah App.1988).

■ Respondents contend that the trial court properly ruled on this issue because, among other reasons,[13] appellants were not entitled as a matter of right to have this issue decided by a jury. In support, they assert that by choosing to integrate this cause of action with their equitable claims for rescission, appellants cannot now claim a right to a jury trial. They cite *Coleman v. Dillman*, 624 P.2d 713 (Utah 1981) as authority for the proposition that, where the issues are predominately equitable in nature, a litigant is not entitled to a trial by jury on legal issues as a matter of right. We are not persuaded that early Utah authority cited by respondents, when read in context, supports this general proposition. *State Bank of Lehi v. Woolsey*, 565 P.2d 413 (Utah 1977); *Sweeney v. Happy Val-*

*ley, Inc.*, 18 Utah 2d 113, 417 P.2d 126 (1966). We are more persuaded by the reasoning in *Valley Mortuary v. Fairbanks*, 119 Utah 204, 225 P.2d 739 (1950), in which the Supreme Court, in an opinion in which Chief Justice Wolfe examined the issue at length, adopted the rule that where plaintiff unites an equitable and legal cause of action, "a jury trial should be accorded the parties on the issues of fact raised in the legal cause of action."

This rule is particularly compelling with the adoption of Utah Rule of Civil Procedure 13(a) governing compulsory counterclaims, which provides:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Clearly, Maxine's claim for damages for the intentional infliction of extreme emotional distress falls into the scope of a compulsory counterclaim.

An annotation states as follows:

The following federal cases dealing with the right to a jury trial of a legal counterclaim interposed in an equity suit were decided after the adoption of the Federal Rules of Civil Procedure, under which a defendant is compulsorily required, subject to certain exceptions not relevant to the present discussion, to assert as a counterclaim any claim he has against the opposing party if it arises out of the transaction or occurrence that is the subject matter of the original action. This requirement is evidently applicable irrespective of whether the counterclaim is one in law, or in equity. Although the opinions in several of these cases do not so state, it would appear from the facts set forth that in all of these cases the

---

13. Respondents also assert no reversible error occurred because (1) under Philippine law there is no cause of action for such claim without attendant physical injury; (2) if a cause of action did exist under Utah law, the court found

as a matter of law that the "evidence did not state a claim"; and (3) if appellants were entitled to a jury determination of this issue, they waived it by failing to make proper objection.

legal counterclaims which were interposed were compulsorily required to be filed, and that they could not thereafter be independently asserted. Because of this fact, and for the reason that to hold otherwise would deny to the counterclaimant his constitutional right to a jury trial, it has been generally held that a legal counterclaim so filed in an equitable action must, on demand of either of the parties, be tried to a jury.

Annotation, *Right in Equity Cases to Jury Trial of Counterclaim Involving Legal Issue*, 17 ALR3d 1321, 1342 (1968) (footnote omitted).

■ The trial court ruled on appellants' claim for severe emotional distress and sent the jury home after they had sat through this ten-day trial. We find upon our review of the evidence, viewed in the light most favorable to Maxine, that the evidence could have allowed a jury to find emotional distress and that it was therefore improper for the court to dismiss the claim. Thus we conclude Maxine was entitled to have her legal claim decided by a jury and so reverse that ruling and remand for a jury trial solely on that issue. The evidence does not support such a claim by Linda or Pete, nor as against Nita, so, as to these parties, the court's ruling is affirmed.

### Findings of Fact

■ Appellants describe the court's findings as a "litany of omissions, half-truths, and unsubstantiated conclusionary findings" which as a whole constitute an abdication of the court's fundamental responsibility to fairly adjudicate and determine the facts pursuant to Utah Rule of Civil Procedure 52(a). Findings of fact and conclusions of law will support a judgment, even though they are general, if they follow the allegations of well-formulated pleadings in most respects. *Pearson v. Pearson*, 561 P.2d 1080 (Utah 1977). Case law, early in Utah's history, fixed a trial court's duty to find upon all material issues raised by the pleadings. *Piper v. Hatch*, 86 Utah 292, 43 P.2d 700 (1935); *West v. Standard Fuel Co.*, 81 Utah 300, 17 P.2d 292 (1932).

■ In summary, appellants state the inadequacies they allege require a new trial. The transcript of the trial reflects conflicts in the testimony, and it is not surprising that counsel do not agree on facts as found by the court based upon the evidence presented to it. Although findings should be made on all material subordinate and ultimate factual issues, it is not necessary that a court resolve all conflicting evidentiary issues. *Sorenson v. Beers*, 614 P.2d 159 (Utah 1980).

As stated, Utah Rule of Civil Procedure 52(a) provides that findings of fact shall not be set aside unless clearly erroneous. A finding attacked as lacking adequate evidentiary support is deemed "clearly erroneous" only if an appellate court concludes that the finding is against the clear weight of the evidence. *Reid v. Mutual of Omaha Ins. Co.*, 776 P.2d 896, 899–900 (Utah 1989). We do not find the court's findings are against the clear weight of the evidence or so clearly erroneous that failure to grant a new trial constitutes a denial of a fair trial. Utah R.Civ.P. 59(a)(1).

### Respondents' Claim for Attorneys Fees

At the conclusion of the evidence, the court held an extensive hearing on the parties' respective motions for a directed verdict, following which the court advised counsel he was going to rule in respondents' favor. Upon hearing the court so state, counsel for respondents stated it had been agreed that the question of attorney fees, provided for in the FSA, would be submitted to the court, either by affidavit or in a further hearing. The findings of fact and conclusions of law make no mention of attorney fees, but the judgment of the court states: "Defendants' claim for attorney fees is denied."

Respondents cross-appeal that ruling, seeking a reversal. A review of both the civil and probate files discloses that on September 9, 1985, the affidavit of R. Brent Stephens, as counsel for respondents, asserted a claim for attorneys' fees for the total amount of $149,490.60 based upon hourly rates set forth therein. Notice of taking the depositions of attorneys Harold Christensen and R. Brent Stephens was filed by appellants' counsel, together with subpoenas duces tecum, on September

13, 1985. Said attorneys filed a motion for a protective order from said notice on September 13, 1985. In a document entitled "Supplemental Objections and Comments to the Proposed Judgment of the Court," filed September 16, 1985, appellants contended there was no basis for attorney fees being awarded as the FSA was not binding until approved by the court and the court could not award attorney fees for legal services rendered prior to such approval. On March 3, 1986, counsel for appellants filed a notice of hearing to the effect that the issue of attorney fees would be heard before the court in Salt Lake City on March 17, 1986. Neither case file contains any further documents relevant to attorney fees.

In *Buehner Block Co. v. UWC Associates*, 752 P.2d 892, 898 (Utah 1988), the Supreme Court said: "Of pivotal concern to us is the lack of any findings to support the trial court's ruling that no attorney fee would be allowed...." We have the same concern. In *Martindale v. Adams*, 777 P.2d 514, 518 (Utah App.1989), this court said: "To permit meaningful review on appeal, it is necessary that the trial court, on the record, identify such factors and otherwise explain the basis for its sua sponte reduction."

In the record, respondents' affidavit in support of its requested fee is undisputed as to amount and reasonableness, with appellants contending that no fee should be awarded at all. The absence in the record before us of findings and conclusions on the issue of attorney fees compels remand to the trial court to correct that deficiency in the record.

We therefore reverse the judgment on the claim for infliction of emotional distress and remand that claim for a trial by jury. We also remand the denial of attorneys fee for further proceedings or supplementation of the record. Otherwise, we affirm the judgment of the trial court.

BILLINGS and GARFF, JJ., concur.