872 A.2d 48

Scott C. BREWER

v.

Walter L. BREWER, Jr., Personal Representative
of the Estate of May C. Brewer.

No. 67, Sept. Term, 2004.

Court of Appeals of Maryland.

April 8, 2005.

Reconsideration Denied May 10, 2005.

Curtis C. Coon (John C. Schropp, Law Office of Curtis C. Coon, LLC, on brief), Towson, for petitioner.

Michael B. Sauer (Keith L. Powell, on brief), Towson, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

The ultimate issue before us is whether the Orphans' Court for Baltimore County erred in denying a petition to reopen an

Estate that had been closed for more than 20 months. In the Orphans' Court and in the Court of Special Appeals, a number of subsidiary questions were raised bearing on that issue, including whether the petition was timely. The only substantive question raised in the petition for *certiorari* was whether an agreement among all of the beneficiaries to distribute certain assets of the Estate in a manner different from that provided for in the testatrix's Will required submission to and approval by the Orphans' Court. We shall answer that question, as framed, in the negative, but, in order to resolve the case properly, we shall also have to address some other issues, including that of timeliness, as well.[1]

---

1. Maryland Rule 8–131(b) provides, in relevant part, that, unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals, the Court of Appeals "ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals." We have tended to apply that Rule strictly and will generally not consider an issue that was not raised in a petition or cross-petition, even if it is an important issue that was raised and decided in the lower courts. Nonetheless, deliberate insertion of the adverb "ordinarily" in the Rule precludes it from being a jurisdictional impediment, and, on rare occasions, we will consider an issue not clearly presented in a petition or cross-petition if the issue is truly important to the outcome and our addressing it will not prejudice any party.

   That is precisely the case here. The issue framed by petitioner, whether the Court of Special Appeals erred in holding that notice, disclosure, and judicial approval of a redistribution agreement is not required necessarily includes consideration of whether such an agreement is even permissible. As to timeliness of the petition to reopen, that was a major issue in both the Orphans' Court and the Court of Special Appeals. It was raised by Walter, Jr. in his brief in this Court ("The Petition to Reopen the Estate was filed by the Appellant . . . over twenty months after the issuance of the Order closing the estate by the Orphans' Court, and well after the applicable limitations periods in § 7–501 and § 10–103 of the Estates and Trusts Article . . ."), and it was discussed at oral argument. Most important, however, to ignore that issue and return the case to the Orphans' Court would serve little purpose. That court could still deny the petition to reopen on the ground of untimeliness and would be entirely correct in doing so, and if, for whatever reason, it chose not to do so and strike its approval of the sixth administration account on the ground that the redistribution agreement was not formally presented to the court, that decision would have little effect at this point, as it would not affect the deeds that have been on record for more than four years. This is thus one of those rare

## BACKGROUND

Walter L. Brewer, Sr. founded a plumbing business, which he incorporated under the name Walter L. Brewer, Inc. After his death in 1986, the corporate stock was left to his widow, May, but the business, in its corporate form, was carried on by three of his five children—Walter, Jr., Brent, and Barry. May died in April, 1997; it is her Estate and her Will that are at issue here.

Walter, Jr. was appointed as personal representative of May's Estate. On October 1, 1997, he filed an Inventory of the Estate that, in addition to certain personal property, listed 13 items of real property, some of which consisted of multiple lots.[2] The real property represented the bulk of the value of the Estate. In her Will, May left the capital stock in the plumbing business to Walter, Jr., Brent, and Barry. She also specifically devised to those three sons, as tenants in common, four improved and two unimproved lots that were used in the plumbing business. The residue of the Estate was left to all five children—Walter, Jr., Brent, Barry, Scott, and May Engle—as tenants in common.

Several of the lots not specifically devised to the three sons were used, or reserved for possible future use, by the plumbing business. Some had been acquired by Walter, Sr. and May as tenants by the entireties prior to Walter, Sr.'s death and devolved to May as the surviving tenant; others were purchased by May, or at least in her name, after her husband's death. It also appeared that May had opened joint bank accounts with each of her children, with differing balances, of which the other children were unaware. In October,

cases in which sound judicial policy requires that we address the timeliness issue, put an end to the litigation, and remove any cloud from the title to the properties.

2. An amended Inventory was filed by Walter, Jr., on January 12, 2000, deleting one of the properties listed on the original Inventory since it was determined that at the time of her death, May did not own that particular piece of property. Accordingly, only 12 items of real property were true assets of her Estate.

1999, the five children, noting both the existence of those accounts and the fact that certain of the real property owned by their mother had been paid for and was being used by the corporation, entered into an Agreement of Distribution.

The Agreement provided, essentially, for two things. First, the amounts in the various joint savings accounts were to be pooled and, to the extent necessary, used to pay taxes and other expenses of the Estate, so that none of the Estate property would have to be sold, and any net balance, after paying those expenses, would be divided equally among the five children. Second, the real property used or reserved for use by the plumbing business would be deeded to the three sons running the business. To that latter end, the children agreed to two deeds, unsigned copies of which were attached to the Agreement. One conveyed the plumbing business lots, aggregated into ten parcels, to the three sons, as tenants in common, and the other conveyed the balance of the lots to the five children, as tenants in common. That distribution scheme, which provided for the conveyance to the three sons of lots that, under the Will, would have passed through the residuary clause to all five children, was obviously inconsistent with the Will.

Prior to the execution of the Agreement of Distribution, Walter, Jr. filed three administration accounts that showed income received and expenses paid by the Estate, but, as no distributions had occurred, none were reported. That was true as well with the fourth and fifth administration accounts filed after the Agreement was signed. The sixth (and final) administration account was filed by Walter, Jr., and approved by the court on January 2, 2001. That account, the approval of which effectively closed the Estate, *did* show the distribution of the Estate, and it showed the distribution of the real property in accordance with the Agreement, rather than in accordance with the Will. On December 29, 2000, contemporaneously with the filing of the final administration account, counsel for the Estate, Benjamin Turner, Esq., filed a fee petition with the court, in which he listed all of the work he had done. He noted in the petition that the sixth and final

administration account had been prepared and that he had also prepared deeds for the distribution of real property in the Estate. On February 26, 2001, following approval of the final administration account, the two deeds implementing the Agreement were filed and recorded.

Copies of all of the administration accounts and a copy of the fee petition were sent to all five children. Scott claimed that he never received any of the administration accounts, although he admitted in testimony that he received copies of the orders approving those accounts. He never denied receiving a copy of the fee petition.

On October 24, 2002—more than twenty months after the sixth and final administration account was approved and the Estate was closed, and eight months after the two deeds implementing the Agreement were recorded—Scott filed, in the Orphans' Court, a petition to reopen the Estate. Although he did not deny having signed the Agreement, he claimed, for the first time, that he signed it without having read it and "without an understanding as to [its] meaning and practical effect." His main complaints seemed to be that (1) the Agreement was never disclosed to the court and that the non-disclosure constituted a fraud on the court, (2) by not providing notice of the sixth administration account to Scott, Walter, Jr. breached his fiduciary duty to Scott and thereby allowed the court to approve the account without an exception from him, and (3) because of its inconsistency with the Will, the Agreement was void in any event. He asked that the Estate be reopened to allow for the filing of an exception to the sixth and final administration account and that the court direct that the Estate be distributed in conformance with the Will. No action was filed in the Circuit Court to declare the deeds invalid.

Walter, Jr., as personal representative, answered the petition and also filed a motion to dismiss it. Denying the substantive allegations, he asserted that, as the distribution in conformance with the Agreement was fully disclosed to the court in the sixth administration account, there was no fraud

on the court, that Scott was well aware of all relevant facts, that copies of all documents, including the sixth administration account, had been mailed to him, and that his petition was untimely.

In testimony at a hearing on the petition, Scott said that, at the urging of Benjamin Turner, the attorney for the Estate, he signed the Agreement without reading it and without knowing that it altered the distribution scheme established in May's Will. He said that Mr. Turner had called him, arranged to meet him at a Holiday Inn about halfway between Baltimore and where Scott lived in Virginia, that they met in the parking lot of the motel, that the Agreement was placed on the hood of Turner's car, that he was asked to sign it, and that he signed it without reading it. Scott stated that he did not receive a copy of the Agreement until March, 2002, when he received a copy from the attorney then representing him,[3] that he never received a copy of the two deeds, and that he would not have signed the Agreement "had the contents been explained to [him]." He asserted that he did not become aware of the contents of the deeds until October, 2002, notwithstanding that unsigned copies of them, in the same form, were attached to and approved in the Agreement.

Much of Scott's testimony was contradicted by Mr. Turner, by Walter, Jr., by Brent and Barry, and by various documents. Turner testified that he sent copies of all six administration accounts to all five children, including Scott. He said that he mailed a copy of the sixth administration account to

---

**3.** Scott testified that he did not receive the Agreement until his former attorney sent it to him in March 2002. In fact, the attorney wrote to Mr. Turner on March 13, 2001, requesting an explanation of the distribution and, on April 14, 2001, Turner responded and sent the attorney a copy of the Agreement. The correspondence between the attorneys is in the record. The attorney forwarded the Agreement to Scott. The record thus shows that Scott had a copy of the Agreement in or about April, 2001, not March, 2002. When shown a copy of his attorney's March 13 letter to Turner, which revealed that the attorney was aware of how the property was distributed and that he had discussed the matter with Scott, Scott said that he was not familiar with the contents of that letter, even though the letter shows that a copy was sent to him.

Scott on December 29, 2000 at the Timonium post office and presented a Post Office certification showing the mailing of an item to Scott on that date. Walter, Jr., who was with Turner at the Post Office, confirmed that testimony. The receipt shows the correct street address and town in Virginia where Scott lived. Although there is a possible discrepancy with respect to the ZIP code stated on the Post Office certification (22013 or 22015, the last number not being entirely clear on the receipt), the item never came back as undelivered.

Turner also testified that Scott had, indeed, read the Agreement before he signed it and that he gave Scott an unsigned copy of the Agreement, to which copies of the two deeds were appended. He added that, when Scott got back into his car, "he had the papers in his hand." Turner confirmed that, on April 14, 2001, he sent a copy of the Agreement to Scott's attorney in response to the attorney's March 13, 2001 letter. With respect to the court's awareness of the Agreement, Turner testified that a copy of the Agreement was shown to the court auditor, although no copy was ever placed in the court file and it was never formally presented to the court itself.

Barry Brewer testified that he and Scott had spoken often about Estate matters, including the properties that were the subject of the Agreement. He stated his belief that Scott "fully understood the ramifications of the agreement of distribution." Barry confirmed that those properties had been purchased with corporate funds, that, although May took title and was the borrower listed on some of the mortgages, the corporation guaranteed and paid the loans, that the properties were being maintained by the corporation, and that the corporation paid the taxes on the properties. Walter, Jr. also testified regarding conversations held with Scott pertaining to the properties. He stated that Scott was told that a distribution agreement would be drawn and what it would do. He said that Scott never objected, either before or after the Agreement was signed.

After three days of hearings and after considering post-hearing memoranda submitted by the parties, the court, on September 4, 2003, entered a brief order summarily denying the petition to reopen the Estate. The order made no findings of fact and gave no reasons. Scott then filed a motion for reconsideration in which he asked the court to make such findings and give reasons for its decision. On September 30, 2003, the court summarily denied that motion, whereupon Scott appealed directly to the Court of Special Appeals, complaining that the Orphans' Court erred in failing (1) to find fraud on the court, (2) to find that Walter, Jr. fraudulently induced him to sign the Agreement, (3) to find that Walter, Jr. breached his fiduciary duty in not distributing the property in accordance with the Will, and (4) to make findings and give reasons.

The intermediate appellate court, in an unreported opinion, found no merit in those arguments and affirmed the judgment. It concluded that (1) agreements like the one at issue here are valid if they comport with contract law and do not affect trusts created under the Will, (2) the Agreement did not have to be presented to or approved by the Orphans' Court, (3) the record did not establish fraud in inducing Scott to sign the Agreement, (4) there was no breach of fiduciary duty by Walter, and (5) the Orphans' Court was "not required to render its decision in any particular form." We granted *certiorari* to consider the single question of whether the Court of Special Appeals erred in finding that "notice, disclosure or judicial approval is not required before a distribution agreement could supersede a properly probated will."

## *DISCUSSION*

Although Scott chose to frame but one issue in his petition for *certiorari*, to dispose of the case properly we need to consider three issues: whether an agreement among beneficiaries, all of whom are competent adults, to distribute non-trust Estate property in a manner different from that provided for in the Will is valid; whether, if so, such an agreement must be presented to and approved by the Orphans' Court;

and whether, in this case, the Orphans' Court erred in denying the petition to reopen the Estate. We shall answer the first question in the affirmative, the second partly in the affirmative, and the third in the negative, and, as a result, we shall affirm the judgment of the Court of Special Appeals.[4]

### Validity of Agreement and Role of Orphans' Court

■ As a preface, it is important to note that the Agreement at issue here was a private one among the five beneficiaries of the Estate that related solely to the distribution of non-trust Estate assets in which only they had an interest. It neither created, eliminated, nor affected the value of any asset or liability of the Estate. Although Walter, Jr., one of the signatories, happened to be the personal representative of May's Estate and would ultimately be responsible for deeding the properties in conformance with the Agreement, he did not sign the Agreement in that official capacity. This is not a case, then, of the personal representative compromising or settling a claim made against the Estate.

The first two questions were considered in *Surratt v. Knight,* 162 Md. 14, 158 A. 1 (1932). The testator in that case, after making certain specific bequests, left all of his residuary estate to three charitable corporations. His daughter filed a caveat to the Will, and the case was transferred to what is now the Circuit Court for trial. While the case was pending in that court, the residuary legatees and the daughter reached a settlement. In return for the daughter refusing to offer evidence at trial, the legatees each assigned to her one-half of their respective legacies. That agreement was implemented and, perhaps in consequence of the daughter offering no

---

4. For guidance to the Orphans' Courts, we note that Maryland Rule 2–522(a), requiring a Circuit Court judge, in a contested court trial, to prepare and file or dictate into the record a brief statement of the reasons for his/her decision, does not apply directly to the Orphans' Courts. *See* Maryland Rules 1–101(b) and 6–461(d). Nonetheless, as a matter of good judicial practice and fairness, those courts should, at least upon request, follow that Rule, make appropriate findings, and give reasons for important decisions. Extensive opinions are not required-just a brief statement of findings and reasons.

evidence, the jury sustained the validity of the Will. The personal representative then filed two administration accounts and distributed all of the bequests except those to the three residuary legatees.

The assignments were placed on record and presented to the personal representative who, believing that the legatees had no power to make such assignments, refused to recognize them. He filed suit in equity against the daughter and the legatees and asked the court to assume jurisdiction over the Estate, construe the residuary clause, determine the validity of the assignments, and direct the personal representative in the administration of the Estate. The defendants objected to intervention by the court but consented to a distribution in accordance with the Will, asserting, however, that the assignments would nonetheless be implemented. The court dismissed the complaint with costs, and the personal representative appealed.

In dismissing the appeal, this Court made two basic rulings. First, citing several earlier cases, it concluded that, because the personal representative is charged with the duty to defend the validity of the Will and "to complete the administration of the estate in accordance with the terms of the will, under the law," the personal representative "should not become a party to any shift or device whereby the will of his testator is collusively avoided, or the intention of the testator is defeated or changed to effect a different disposition of his estate." *Id.* at 16, 158 A. at 2. The personal representative, the Court noted, had performed his duty by successfully defending the Will. With respect to the settlement, the Court observed:

"These three legatees can do what they like with their own, and the executor, *qua* executor, cannot in any manner control or prevent this freedom of disposition, which is of the substance of their property rights. So, either before, during, or after the caveat to the will, it was competent for all the testamentary beneficiaries and next of kin of the testator, as they were *sui juris*, to renounce the provisions of the will and agree, for a consideration, that the residuary

estate should be divided among them in specified proportions."

*Id.* at 17, 158 A. at 2.

As a consequence, the Court added that, "[i]n his capacity as executor or individually, the complainant could not raise the question whether or not the compromise of the litigation by the [residuary legatees] is *ultra vires.*" *Id.* For that reason, there was no error in the dismissal of the equity complaint. Once the complaint was dismissed, the personal representative had no personal interest in further litigation, and it was for that reason that his appeal was also dismissed.

In *Hohman v. Hohman,* 164 Md. 594, 615, 165 A. 812, 820 (1933) and *Caughy v. Safe Deposit & Trust Co.,* 196 Md. 252, 261, 76 A.2d 323, 327 (1950), citing *Surratt,* we confirmed the ability of competent beneficiaries to reach an agreement to distribute an Estate in a manner different from that set forth in the Will. That principle is widely recognized in other States as well; indeed, subject to the normal rules of contract law, those kinds of agreements, commonly referred to as family settlement agreements, are favored in the law.[5] Although some of the settlement agreements at issue in the various cases, as in *Surratt,* were designed to resolve litigation regarding the validity of the Will or a provision or bequest in a

---

5. *See Harris v. Harris,* 236 Ark. 676, 370 S.W.2d 121 (1963); *Haley v. Regions Bank,* 277 Ga. 85, 586 S.E.2d 633 (2003); *Foltz v. Wert,* 103 Ind. 404, 2 N.E. 950 (1885); *Matter of Gustafson,* 551 N.W.2d 312 (Iowa 1996); *Matter of Estate of Hessenflow,* 21 Kan.App.2d 761, 909 P.2d 662 (1995); *In re Estate of McRight,* 766 So.2d 48 (Miss.App. 2000); *Richmond v. Wohlberg,* 385 Mass. 290, 431 N.E.2d 902 (1982); *Estate of Webster,* 920 S.W.2d 600 (Mo.App.1996); *Cahill v. Armatys,* 185 Neb. 539, 177 N.W.2d 277 (1970); *Matter of Estate of Cruse,* 103 N.M. 539, 710 P.2d 733 (1985); *In re Smith's Estate,* 44 A.D.2d 851, 355 N.Y.S.2d 994 (1974); *Matter of Estate of Outen,* 77 N.C.App. 818, 336 S.E.2d 436 (1985); *Drummond v. Johnson,* 643 P.2d 634 (Okla. 1982); *In re McCrea's Estate,* 475 Pa. 383, 380 A.2d 773 (1977); *Matter of Estate of Krause,* 444 N.W.2d 4 (S.D.1989); *Mason v. Pearson,* 668 S.W.2d 656 (Tenn.App.1983); *Shepherd v. Ledford,* 926 S.W.2d 405 (Tex.App.1996); *Matter of Estate of Grimm,* 784 P.2d 1238 (Utah Ct.App.1989); *Augustine v. Gibson,* 429 P.2d 314 (Wyo.1967).

Will, the existence of a dispute is not ordinarily a prerequisite. *See Pfaff v. Clements*, 213 Ark. 852, 213 S.W.2d 356 (1948).

Some courts require settlement agreements to be presented for approval to their States' equivalent of our Orphans' Courts, while others do not. *Compare Matter of Estate of Wise*, 20 Kan.App.2d 624, 890 P.2d 744 (1995) (agreement must be submitted to and approved by court to obtain decree of final settlement) with *Leone Hall Price Foundation v. Baker*, 276 Ga. 318, 577 S.E.2d 779 (2003) (approval not required) and *Matter of Estate of Grimm, supra*, 784 P.2d 1238 (approval not required where parties are legally competent to contract). To some extent, the matter seems to be governed by statute.

Maryland has no statute specifically requiring family settlement agreements to be submitted to or approved by the Orphans' Court. Maryland Code, § 9–105(a) of the Estates & Trusts Article requires the personal representative to execute and deliver deeds implementing the distribution of assets in kind, but that is essentially a ministerial duty necessary to transfer title. Nonetheless, there are two good reasons for any such agreement that calls for distribution in a manner inconsistent with the Will to be at least a matter of record in the Orphans' Court.

The first is that requiring any redistribution agreement to be placed in the record of the Orphans' Court proceeding and brought to the attention of both the Register of Wills and the court is critical in preventing fraud and assuring regularity and consistency in the Orphans' Court proceeding. The personal representative has a fiduciary duty to "settle and distribute the estate of the decedent in accordance with the terms of the will and the estates of decedents law." Estates and Trusts Article, § 7–101(a). The function of the administration accounts filed by the personal representative is to document that he/she is properly administering the Estate. Those accounts must be audited by the Register of Wills and approved by the Orphans' Court before distributions can lawfully be made.

If the account shows a distribution inconsistent with the Will and there is no adequate documentation attached to it to explain the inconsistency, the Register cannot complete a proper audit and the court cannot properly approve the account. Anyone examining the record, bereft of the redistribution agreement, would have to conclude that the account is incorrect and should not be approved, as there would be nothing to explain why property left by the Will to X is being distributed to Y.

Requiring a redistribution agreement to be of record in the Orphans' Court is particularly important when the agreement concerns real property. The personal representative's deed serves as the link in the chain of title between the decedent and the grantee, and it should therefore contain a recital identifying the decedent, his/her date of death, and the Orphans' Court proceeding. *See* ALLAN J. GIBBER, GIBBER ON ESTATE ADMINISTRATION (4th ed.2001), § 9.92 and Forms, § 9.103. That allows anyone searching the title to make the connection and trace the property from the grantee through the Orphans' Court proceeding to the decedent. If the agreement is not in the Orphans' Court record, or separately recorded among the land records, however, there will be a disconnect. The Will will show the property devised to X, but the deed will show it conveyed to Y, with no documentation to justify the difference. Even a recital in the personal representative's deed referencing an agreement (which was missing from the deed in this case) will not suffice for this purpose; a careful title searcher would want to examine the agreement itself, at least to be satisfied that such an agreement actually exists and that the conveyance is in conformance with it.

We conclude, therefore, that (1) redistribution agreements are permissible and, so long as they comply with the requirements of basic contract law, neither the personal representative nor the court has any authority to disapprove or veto them, but (2) if they are to be implemented as part of the Orphans' Court proceeding, through a deed from the personal representative pursuant to an approved administration ac-

count, they must be attached to that account or otherwise made part of the Orphans' Court record. The account must not simply show the distribution in accordance with the agreement but must identify the agreement, incorporate it by reference, and clearly reflect that the distribution is being made pursuant to the agreement rather than pursuant to the Will.

## *This Case*

■ The sixth administration account filed in this case clearly did not comply with these requirements, and, in the absence of any finding by the Orphans' Court that it was aware of the Agreement, we are at a loss to understand how that account, facially inconsistent with the Will, could properly have been audited and approved. Nonetheless, on this record, we find no substantive error in the orders of the court denying the petition to reopen and the motion for reconsideration.

The gravamen of Scott's complaint was that he was unaware of the contents of both the Agreement and the sixth administration account, that court approval of the Agreement was required, and that the court should reopen the Estate so that he could file an exception to that account and the court could direct distribution in conformance with the Will. It would certainly have been helpful, in light of the conflicting evidence, if the court had made findings regarding what Scott knew and when he knew it. As noted, there was substantial evidence that he was fully aware of the contents of the Agreement and the attached deeds when he signed the Agreement and that he had received a copy of both the sixth administration account and the fee petition that mentioned that account. He admitted receiving a copy of the order approving the sixth administration account. More important, there was no substantial evidence that Walter, Jr., or anyone else deliberately kept Scott in the dark. If he received a copy of the order approving the sixth administration account but had not, in fact, received a copy of the account, he had an obligation to inquire. Certainly, upon recordation of the two deeds on February 26,

2001, he was on constructive notice of how the real property was distributed.

Maryland Code, Estates and Trusts Article, § 7–501(b) and Maryland Rule 6–417(f) require that exceptions to an account must be filed with the Register within 20 days after approval of the account by the court. That obviously was not done, and, as a result, the Estate was closed and the deeds implementing the Agreement were executed and recorded. Rule 6–417(g) makes clear that, if timely exceptions are not filed, "the order of the court approving the account becomes final." In the absence of any finding by the court of fraud, mistake, or irregularity, there was no basis for the court to reopen the Estate to permit an exception to be filed to the final administration account on a petition filed 20 months after the Estate had been closed.[6] It is principally for that reason that we shall affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.**

RAKER, J., dissenting:

The majority apparently believes that if an issue is "truly important" to the outcome of a case, this Court should deviate from its longstanding practice of not considering an issue unless it is raised in a certiorari petition.[1] *See* Maj. Op. at 185

---

**6.** Maryland Rule 2–535(b), allowing a Circuit Court to exercise revisory power over an enrolled judgment upon a showing of fraud, mistake, or irregularity does not directly apply to the Orphans' Courts, although, under Rule 6–461(d) those courts could possibly make that Rule applicable. Whether a similar power stated in Maryland Code, Courts and Judicial Proceedings Article, § 6–408 was intended to apply to the Orphans' Courts is not clear. We need not address those questions in this case, as no finding of fraud, mistake, or irregularity was made by the court. Apart from that, even if the court were to grant the petition, strike its approval of the final administration account, and direct distribution in conformance with the Will, its order could not affect the deeds that had been recorded. Scott would then have to file a complaint in the Circuit Court to invalidate those deeds, which would raise a most serious issue of laches.

**1.** Harmless error is the one exception to this principle, and that exception is contained expressly in Md. Rule 8–131(b). Before Rule 8–

n. 1, 872 A.2d at 49 n. 1. I disagree, and would abide by the principle we have followed consistently since becoming a certiorari court more than three decades ago.

Our jurisprudence on this issue is very clear. *See, e.g., Finucan v. Board of Physicians Quality Assurance*, 380 Md. 577, 589, 846 A.2d 377, 384 (2004) (holding that petitioner waived constitutional and procedural issues by not raising them in the Petition for Writ of Certiorari and Court will not consider the issues); *Calvert Joint v. Snider*, 373 Md. 18, 31 n. 8, 816 A.2d 854, 861 n. 8 (2003); *Middle States v. Thomas*, 340 Md. 699, 702, 668 A.2d 5, 6–7 (1995); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 568–569, 659 A.2d 1295, 1299 (1995) (noting that choice-of-law issue was not within the certiorari question and was therefore not properly before Court); *McElroy v. State*, 329 Md. 136, 146, 617 A.2d 1068, 1073 (1993) (noting that, because petitioner's first argument was not in his Petition for Writ of Certiorari, the issue was not properly before Court); *State v. Lancaster*, 332 Md. 385, 402 n. 12, 631 A.2d 453, 462 n. 12 (1993); *Batson v. Shiflett*, 325 Md. 684, 700–01, 602 A.2d 1191, 1199–1200 (1992); *Ungar v. Handelsman*, 325 Md. 135, 147, 599 A.2d 1159, 1164–65 (1992); *Gonzales v. State*, 322 Md. 62, 69, 585 A.2d 222, 226 (1991); *Stinnett v. Cort Furniture*, 315 Md. 448, 452 n. 2, 554 A.2d 1226, 1227 n. 2 (1989); *Wagner v. Doehring*, 315 Md. 97, 103 n. 4, 553 A.2d 684, 687 n. 4 (1989); *Neal v. Fisher*, 312 Md. 685, 690–91 n. 5, 541 A.2d 1314, 1317 n. 5 (1988); *Maus v. State*, 311 Md. 85, 106, 532 A.2d 1066, 1077 (1987); *Allgood v. State*, 309 Md. 58, 82, 522 A.2d 917, 929 (1987); *Wright v. State*, 307 Md. 552, 587, 515 A.2d 1157, 1175 (1986); *Md.-Nat'l Cap. P. & P. Comm'n v. Crawford*, 307 Md. 1, 36–37, 511 A.2d 1079, 1097–98 (1986); *Clark v. State*, 306 Md. 483, 491–92, 510 A.2d 243, 247 (1986); *Fred W. Allnutt, Inc. v. Comm'r Lab. & Ind.*, 289 Md. 35, 39 n. 2, 421 A.2d 1360, 1362 n. 2 (1980); *McMorris*

---

131(b) was amended to include this exception, this Court would not consider harmless error arguments unless raised in a certiorari petition, cross-petition, or order of this Court. *See Clark v. State*, 306 Md. 483, 492, 510 A.2d 243, 247 (1986); *Coleman v. State*, 281 Md. 538, 547, 380 A.2d 49, 55 (1977).

*v. State,* 277 Md. 62, 70–71 n. 4, 355 A.2d 438, 443 n. 4 (1976); *Walston v. Sun Cab Co.,* 267 Md. 559, 569, 298 A.2d 391, 397 (1973); *Maryland State Police v. Zeigler,* 330 Md. 540, 562–63, 625 A.2d 914, 925 (1993); *Clark v. Elza,* 286 Md. 208, 219 n. 4, 406 A.2d 922, 928 n. 4 (1979); *Huger v. State,* 285 Md. 347, 354, 402 A.2d 880, 885 (1979); *Mazor v. State, Dep't of Correction,* 279 Md. 355, 370–71 n. 8, 369 A.2d 82, 92 n. 8 (1977).

While Rule 8–131(b) contains the language that this Court "ordinarily" will consider only an issue raised in a certiorari petition, a cross-petition, or an order of this Court, indicating exceptions to the general rule, it should not be interpreted as enabling this Court to consider an issue not raised merely because it is "important" to the decision. As Judge Eldridge explained in his dissent in *State v. Broberg,* 342 Md. 544, 573, 677 A.2d 602, 616 (1996):

"The word 'ordinarily' does indicate that there are exceptions. Nevertheless, neither the use of the word 'ordinarily' in Rule 8–131(b) nor the principle embodied in the rule, has been treated as granting a general discretion to reach an issue whenever the Court so desires in the interests of 'fairness.' If it did, the amendment to Rule 8–131(b), adopting an express exception for the 'harmless error' issue, would have been unnecessary. Instead, we have held that the 'exceptions' to the principle embodied in Rule 8–131(b) are limited to 'extraordinary circumstances.' " (Footnotes and citations omitted).

I am not persuaded that this case fits into our accepted category of "extraordinary circumstances." I therefore would not consider the timeliness issue upon which the majority apparently bases its decision.

The only issue properly before us is the question of whether agreements such as the one at issue must be presented to and approved by the Orphans' Court. I agree with the majority that if agreements of this type are to be implemented as part of the Orphans' Court proceeding, through a deed from the personal representative pursuant to an approved administra-

tion account, then they must be attached to that account or otherwise made part of the Orphans' Court record. *See* Maj. Op. at 196–97, 872 A.2d at 56. I also agree that the administration account in this case did not comply with these requirements. *See* Maj. Op. at 197, 872 A.2d at 56. Because the Court of Special Appeals held to the contrary, and because it was this holding, and this holding alone, that was raised in the Petition for Writ of Certiorari, I would reverse the judgment.

Accordingly, I respectfully dissent.